Carol MEADOWS, Plaintiff,

v.

Colin GUPTILL, et ux., et al., Defendants.

Civ. No. 89–2136 PHX SC.

United States District Court, D. Arizona.

July 2, 1993.

Michael B. Scott, Phoenix, AZ, for plaintiff.

James McConnell Bush, Lowe & Berman, Jane E. Reddin, Lewis & Roca, Phoenix, AZ, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONTI, District Judge.

## I. INTRODUCTION

Plaintiff Carol Meadows, the former Town Clerk of the Town of Kearny, Arizona, alleges that former Town Council member Colin Guptill sexually harassed her. Meadows brings a claim against the Town for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, on a "hostile work environment" theory. Meadows also brings a claim of common law battery against Guptill.

This matter came before the Honorable Samuel Conti[1] for a bench trial on June 21–23, 1993. The court is now called upon to make findings of fact and conclusions of law.

## II. FINDINGS OF FACT

Kearny, Arizona is a small town approximately 100 miles from Phoenix, with a population of about 2,500 persons. Numerous witnesses testified that Kearny is the kind of town "where everyone knows everybody else."

---

1. United States District Judge, Northern District of California, sitting by designation.

Plaintiff Carol Meadows became the Town Clerk in October, 1978. The Town Clerk is appointed by the Town Council, and serves at the pleasure of the Council. The Town Clerk has an office in the Kearny Town Hall, adjacent to the Town Council's Chambers, in which town meetings are conducted. Meadows served as Town Clerk until May 17, 1989.

Meadows alleges that she was sexually harassed by defendant Colin Guptill, a former member of the Town Council. Guptill was elected to the Town Council in June, 1986, and served until he was recalled in November, 1989. Town Council members do not have regular office space or desks in the Town Hall, but several witnesses testified that Guptill would stop by the Town Hall usually three times per week, whether for town business or for other reasons. Meadows alleges that Guptill habitually harassed her with rude comments and unwanted touching whenever he visited the Town Hall.

At a Town Meeting on May 17, 1989, Guptill circulated a list of allegations of poor work performance by Meadows, and the Town Council voted 4–3 to terminate her employment. Guptill voted for her termination.

Meadows brought this action shortly after the town voted to terminate her employment. She asserted *inter alia* claims against the town for sexual harassment in violation of Title VII of the Civil Rights Act of 1964, and common law claims against Guptill and others for wrongful termination, intentional infliction of emotional distress, and battery. On the defendants' motion for summary judgment, Judge Roger G. Strand held that the Town terminated Meadows for poor job performance, and not in retaliation for her threatening to sue over Guptill's alleged harassment. The court also dismissed most of Meadows' common law claims.[2]

The case came before the court for a bench trial on June 21–23, 1993 on Meadows' remaining claim against the Town for violation of Title VII on a theory of a hostile work environment, and her claim against Guptill for common law battery.

At trial, the parties directed the proof towards three issues: (1) whether Guptill sexually harassed Meadows; (2) if so, whether the Town knew or should have known of Guptill's conduct; and (3) whether Meadows suffered any recoverable damages from Guptill's alleged conduct.

### A. Evidence of Sexual Harassment

Meadows testified that whenever Guptill visited the Town Hall he directed rude and suggestive comments to her. These comments included:

"Feed me or breed me";

"Stand up, let me see how you feel"; and

"What, you're not wearing a low-cut blouse?"

Meadows testified that she often was alone in the Town Hall when Guptill made these comments.

Meadows also testified to several specific incidents which she considered harassment by Guptill. At one Town staff meeting, someone asked Guptill what color he would like to paint the Town's water tower. Guptill responded, "Titty pink, like the color of Chief Huntsman's left boob." Huntsman, the Town's female fire chief, was present at the meeting, and according to testimony, she was not offended. Meadows, though, was extremely embarrassed by Guptill's remark, even though it was not directed at her personally.[3]

Geoffrey Sommers, a member of the Town Council at the time, recalled a Town staff meeting where Meadows, Guptill, Thompson, and others were present. Someone produced a plaque, to which was attached a large pair of rubber breasts. (The plaque was intended to be a humorous gift for someone else, but the group thought better of it and decided not to give it.) Guptill commented, "No need to give them to [Meadows]." Meadows (who is buxom) believed Guptill was commenting

---

2. *See* Order of the Honorable Roger G. Strand, dated November 16, 1992. The case was subsequently reassigned to Judge Conti.

3. There was no testimony as to the actual date of this incident, though other witnesses confirmed Meadows' account.

on the size of her breasts, and was extremely embarrassed by the entire incident.

In June, 1988, Meadows and other representatives of the Town of Kearny attended the Arizona League of Towns and Cities annual convention in Scottsdale. According to Meadows, Guptill approached her while she was talking with a group of convention-goers, from both Kearny and other towns. Guptill allegedly told Meadows, loud enough for all to hear, to "Smile if you got a little last night."

On or about October 5, 1988, Meadows was alone in the Town Hall supply room when Guptill cornered her and forcibly rubbed his body against hers. Meadows testified that she did nothing to encourage or invite Guptill's approach, and that she escaped from the supply room as soon as she could.

These were not isolated incidents, according to Meadows. Meadows testified that whenever no one else was around to see, Guptill would touch her. If Guptill encountered her while she was standing up, he would grab or pat her derriere. If he encountered her while she was sitting down, he would pull at her blouse to try to look at her breasts. Sometimes, Meadows testified, she would pull out the drawers of her desk to create a physical barrier between Guptill and herself.

Meadows was happily married until January 21, 1989, when her husband died from a heart attack. By all accounts, Meadows was severely depressed after her husband's death. However, Meadows testifies that even though Guptill was aware of her loss, he did not cease his harassment. According to Meadows, Guptill's comments and uninvited touching actually increased in frequency after her husband's death. She testified to one specific incident a few months after her husband died, in late March or early April, 1989, where, instead of patting her, Guptill grabbed her buttocks with both hands.

On May 5, 1989, Guptill received permission from the Town Manager to use Meadows' computer. Meadows was using her computer at the time, and was unaware that the Town Manager had told Guptill that he could use it. Guptill became frustrated while waiting for Meadows to relinquish her workstation. According to testimony, he screamed at Meadows, "What have you been doing—sitting around with your finger up your butt?" Meadows testified that she was extremely frightened and left her work area as quickly as possible.

According to Meadows, Guptill continued this behavior unabated from approximately December, 1986 until the day the Town Council terminated Meadows' employment.

Guptill admitted at trial that he made most of the comments to which Meadows testified. However, he stated that he always directed these comments to someone else, or to a room of people in general, and not at Meadows specifically. Steve Thompson, the former Town Manager, supported this testimony. Guptill also swore that he only touched Meadows on two occasions: Once, he testified, he kissed her drunkenly at his daughter's wedding. Meadows denied this ever happened. Another time, Guptill said, he "patted her on the fanny" in the Town Hall. When the court asked why he "patted her fanny," Guptill stated, "It looked inviting."

Guptill testified that he recalled encountering Meadows in the supply room, but he claimed he was there only to get a travel voucher, and not to harass Meadows. He stated that if any physical contact with Meadows occurred in the supply room, it was accidental. He denied ever touching Meadows on any other occasion.

Meadows' version of events, however, is substantially supported by the testimony of other witnesses.

Geoffrey Sommers was present at the meeting where Guptill commented on Meadows' breasts. Sommers also testified that he once saw Guptill block Meadows' path in a hallway in the Town Hall, about three feet wide. According to Sommers, Meadows turned sideways and pressed her back up against the wall in order to let Guptill pass without touching her. Guptill, though, turned sideways to face her, and forcibly rubbed his body up against hers. Guptill said something to Meadows, which Sommers could not hear. Meadows sidestepped Guptill to get away from him.

Gerry Russell, a Kearny businessman, testified to an incident he saw in the Town Council's Chambers shortly before a Town Meeting, where he was scheduled to appear. While he was waiting for the meeting to begin, Russell saw Meadows bending over her desk trying to put a tape into a tape recorder, when Guptill grabbed her blouse and tried to look at her breasts.

The court also heard the deposition testimony of Michael Bidegain, who stated that while in the Town Hall he saw Guptill pinch Meadows on the rear. According to Bidegain, Guptill stated something like "You should put on a little weight, you would be better for loving."

Ray Burgess, the Town Maintenance Director, testified that he once walked into the Town Hall and saw Guptill pinning Meadows up against a wall, with only a few inches between their faces. According to Burgess, Meadows appeared scared. Guptill let Meadows go once he saw that Burgess, a good friend of Meadows, had arrived.

Guptill provided no explanation for the incidents to which Sommers, Russell, Bidegain, and Burgess testified. He also denied making the comment "smile if you got some last night" at the League of Towns and Cities Convention, even though this comment was overheard by others, including Thompson.

The Town and Guptill offered the testimony of Mark Phelps, a Town Council member at the time. Phelps testified that Meadows was very friendly and "touchy" with her colleagues at the Town Hall, including Guptill. Phelps even claims to have seen Meadows sitting on Guptill's lap in a hotel room at the League of Towns and Cities Convention. Meadows pointed out, however, that her husband was with her at the convention, and she adamantly denied Phelps' claim. No other testimony, including Guptill's, supports Phelps' allegation, and the court finds that this incident did not happen.

Phelps also testified, along with Ken Huish, a Town Council member at the time, and now the current mayor of Kearny, that Meadows would wear dresses and blouses at work that revealed substantial cleavage. All of the witnesses called by plaintiff, by contrast, testified that Meadows' manner of dress was nothing but professional.

■ As substantive evidence on the issue of whether Guptill's conduct was unwelcome, evidence of Meadows' manner of dress and "touchy" behavior has very little probative force, given the nature of Meadows' allegations. When a woman wears a revealing dress or blouse to work, it is not an invitation to her co-workers or supervisors to grab and pull at it to see more.[4] Likewise, "touchy" behavior, such as grabbing one's arm in a conversation, does not invite in return a pat on the buttocks or one's more private areas. This is true under any acceptable standards of workplace behavior, even in an informal work environment such as the Kearny Town Hall.

■ To be sure, plaintiff's attorney "opened the door" to the admission of much of this evidence for purposes of impeachment, by introducing testimony that Meadows always dressed conservatively and never would say or do anything unprofessional in the workplace. However, this evidence only impeaches small details of Meadows' testimony. Meadows version of events was corroborated substantially by several other witnesses, and Meadows otherwise was unshaken by cross-examination.

## B. Evidence of Whether the Town Knew of Guptill's Conduct

In December, 1986, when Meadows alleges that Guptill first started harassing her, Betty Stoddard was the Town Manager. Meadows never informed Stoddard of Guptill's conduct.

In June, 1987, Steve Thompson became the new Town Manager. Meadows testified that she told Thompson on five or six occasions that Guptill was harassing her. She testified that she gave up trying to persuade Thompson to do anything in October, 1988. According to Meadows, Thompson had assured her that he would speak to the mayor about Guptill's behavior.

---

4. This is not to suggest that Meadows ever wore attire in the workplace that would be considered inappropriate under any standard. The evidence indicated otherwise.

Thompson, however, denied that Meadows ever complained to him, although he admitted hearing Guptill make many of the same comments to which Meadows testified. Thompson testified that whenever he heard Guptill make these comments, they were directed at a room full of people, and not at Meadows specifically. Thompson also denied ever seeing Guptill touch Meadows. He testified that if had known of any of Meadows' allegations, he would have told the mayor, and also would have sought advice from the Town Attorney.

The court saw Thompson as a biased witness, however. Thompson admitted that at the time he was relatively new as Town Manager. He was likely, then, to be hesitant about doing anything to upset Guptill, who by all accounts was one of the most powerful persons in Kearny. In addition, Thompson was instrumental in helping Guptill to have Meadows' employment terminated. Thompson admitted that he had assisted Guptill to compile a list of allegations of poor work performance by Meadows. Guptill circulated this list at a Town Meeting, and the Town Council thereafter voted to terminate Meadows' employment. Furthermore, the court was unimpressed with Thompson's demeanor on the witness stand. The court, therefore, did not find credible Thompson's assertion that Meadows never complained to him about Guptill's conduct.

■ Defendants argued that Meadows' testimony was made less believable because, by her own admission, she did not complain about Guptill to the mayor or any other Council member, even though she knew most of these people socially. However, there was substantial evidence that the appropriate thing for Meadows to do under the Town's "chain of command" was to go first to the Town Manager. Meadows testified that she did this on several occasions, and was assured by Thompson that he would inform the mayor.

Meadows also provided many credible reasons for not going to the mayor or other Council members. She stated that she preferred to keep her work life and social life separate, so she did not mention Guptill's behavior outside of the office. Also, many of the people who, in defendants' view, Meadows should have gone to for help were friends of Meadows' husband. Meadows testified that she did not want her husband to know about Guptill's conduct, both because she wanted to handle it herself and because she was afraid that her husband would angrily confront Guptill. Numerous witnesses stated that Meadows' husband would have "clobbered" Guptill had he known of his conduct. It is perfectly believable that Meadows would wish to avoid a confrontation between her husband and one of the most powerful men in Kearny.

## C. *Evidence of Damages*

■ Meadows sought treatment beginning in February 1989 for severe emotional distress and depression. Her treating psychotherapist, Dr. E. Douglas Brown, diagnosed her as suffering from a "major depressive episode," characterized by a loss of sleep, loss of appetite, and a deep sense of hopelessness. Meadows mentioned during one session with Dr. Brown that she believed she had been sexually harassed at work. Dr. Brown testified, though, that in his judgment it was more pressing for him to address the recent death of Meadows' husband. He did not follow up on her mentioning of sexual harassment.

Defendants argued, based on Dr. Brown's testimony, that any emotional distress suffered by Meadows was due to her husband's death, and not due to Guptill's conduct. However, given the severity and pervasiveness of Guptill's harassment, some component of Meadows' distress certainly is traceable to Guptill's actions.

Meadows testified at trial that she felt violated by Guptill's actions and was extremely embarrassed and humiliated by his comments. She had been Town Clerk for eight years without incident, and by all accounts she took enormous pride in her job. Meadows testified that after Guptill was elected to the Town Council and began harassing her, she could no longer work at the Town Hall without apprehension and anxiety over Guptill's frequent visits.

Meadows also testified that because Guptill's behavior continued after her husband's death, it aggravated the distress Meadows already was suffering from the loss of her husband.

## III. SUMMARY OF FINDINGS

Pursuant to Federal Rule of Civil Procedure 52(a), the court makes the following specific findings of fact:

1. Defendant Town of Kearny is a Town duly organized under the laws of the State of Arizona.

2. The Town of Kearny at all relevant times employed 15 or more employees, but always less than 100.

3. Plaintiff Carol Meadows was an employee of the Town of Kearny from October, 1978 until May 17, 1989.

4. At all times relevant herein, Meadows was the Town Clerk. The Town Clerk serves at the pleasure of the Town Council.

5. Defendant Colin Guptill was an elected Town Council member from June, 1986 until November, 1989.

6. As a member of the Town Council, Guptill could vote to terminate Meadows' employment.

7. The Kearny Town Hall consists of nothing more than three ordinary office-sized rooms, the Town Council's Chambers, a bathroom, and a supply room. Town Council members are not provided office space or desks in the Town Hall.

8. Defendant Guptill visited the Town Hall on average three times per week, whether for Town business or otherwise.

9. During most of Guptill's visits to the Town Hall he directed comments of a sexual nature towards Meadows, including:

"Feed me or breed me";

"Stand up, let me see how you feel"; and

"What, you're not wearing a low-cut blouse?"

10. In the Town Council's Chambers before a Town Meeting in either January or February, 1988, while Meadows was bending over to put a tape in a tape recorder, Guptill grabbed Meadows' blouse and attempted to look at her breasts. Witnesses were present in the Council's Chambers when this incident occurred.

11. At a Town staff meeting, with Meadows present, someone asked Guptill what color he would like to paint the Town water tower. Guptill responded, "Titty pink, like the color of Chief Huntsman's left boob."

12. At another staff meeting, with Meadows present, someone produced a plaque with a pair of large rubber breasts attached. Guptill commented, "No need to give them to [Meadows]." Meadows was extremely embarrassed by the incident. Geoffrey Sommers, a member of the Town Council, and Steve Thompson, the Town Manager, were in attendance at this meeting.

13. In June, 1988, Meadows attended the Arizona League of Towns and Cities Convention in Scottsdale, Arizona. Guptill approached Meadows, who was talking to a group of people from Kearny and elsewhere, and told her, so that everyone could hear, to "smile if you got a little last night."

14. On or about October 5, 1988, Guptill cornered Meadows in the supply room of the Town Hall. Without provocation or encouragement by Meadows, Guptill pressed his body against hers.

15. Guptill once encountered Meadows in a hallway at the Town Hall, about three feet wide, and pressed his body up against hers, refusing to let her pass without any physical contact. One member of the Town Council, Geoffrey Sommers, witnessed this incident, though he did not recall the exact date.

16. Sometime in November, 1988, Guptill pinched Meadows on her rear end and told her something like, "You should put on a little weight, you would be better for loving." Michael Bidegain witnessed this incident.

17. On many of Guptill's visits to the Town Hall, he either patted Meadows on her rear end or attempted to look down her blouse, or caused Meadows to take shelter behind pulled-out desk drawers to avoid Guptill touching her.

18. Meadows' husband died on January 21, 1989 from a heart attack.

19. Guptill was aware of the death of Meadows' husband.

20. On or about March 28, 1989, in the Town Hall, Guptill grabbed Meadows buttocks with both hands.

21. On or about May 5, 1989, Meadows was forced to leave her work area after Guptill screamed at her, "What have you been doing—sitting around with your finger up your butt?"

22. Meadows told Steve Thompson, the Town Manager, on five or six occasions between June, 1987 and October, 1988 that Guptill was harassing her.

23. Thompson assured Meadows that he would inform the mayor of Guptill's behavior.

24. The Town of Kearny, through its employees and agents, did nothing to address Guptill's behavior. Neither Thompson, nor any member of the Town Council, confronted Guptill in any way regarding Meadows' allegations.

25. Meadows found Guptill's comments, listed above, to be offensive and humiliating.

26. Guptill's physical touching of Meadows' person on all the above occasions was unwelcome. Meadows did not ever invite Guptill to touch her, nor did she consent to it.

27. Because of Guptill's conduct, Meadows' days at work were dominated by feelings of apprehension and anxiety, both before and after her husband died.

28. In February, 1989, Meadows began seeing a psychotherapist, Dr. E. Douglas Brown, who treated her for depression and severe emotional distress.

29. Meadows' symptoms included loss of appetite, inability to sleep, and a deep sense of hopelessness.

30. Guptill's conduct in the workplace toward Meadows after the death of her husband aggravated these symptoms.

## IV. CONCLUSIONS OF LAW

### A. *Meadows' Claim Under Title VII for a Hostile Work Environment*

■ To prevail on her claim that the Town is liable under Title VII for hostile work environment sexual harassment, Meadows must show that:

(1) She was subjected to unwelcome verbal or physical conduct of a sexual nature;

(2) A reasonable woman would consider the conduct sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment;

(3) The Town management knew or should have known about the harassment and failed to take adequate remedial measures to end it.

*See Ellison v. Brady,* 924 F.2d 872, 876, 879 (9th Cir.1991); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1515–16 (9th Cir.1989).

■ As set forth above, the court has found that Guptill frequently subjected Meadows to abusive words and touching, the sexual nature of which speaks for itself. The court has also found that these actions were unwelcome.

There is no question, in this court's view, that a reasonable woman in Meadows' position would have considered the conditions of her employment altered, and found the working environment abusive. The Town did not seriously contest this issue at trial, and for good reason. Meadows was subjected to verbal abuse up to three times a week according to her testimony. She also had to contend with Guptill's patting her buttocks and looking down her blouse, as well as with the more severe incidents in the supply room and in the hallway. Guptill, though not Meadows' immediate supervisor, had the power to call a vote to terminate Meadows' employment (as indeed he did on May 17, 1989) if she were to complain to him directly. This left Meadows in a situation where there was little she could do but to tolerate Guptill's continued harassment.

The court has found that on several occasions Meadows informed Steve Thompson, the Town Manager, that Guptill was harassing her. In addition, one member of the Town Council, Geoffrey Sommers, actually witnessed two incidents of harassment. Sommers was present when Guptill commented on the size of Meadows' breasts, and he also saw Guptill block Meadows' path in the Town Hall hallway and forcibly press his

body against her. Thus, the Town had actual knowledge of Guptill's harassment of Meadows.

■ Title VII requires employers to intervene promptly and effectively to put an end to workplace sexual harassment. *Intlekofer v. Turnage*, 973 F.2d 773, 778 (9th Cir.1992). Having knowledge of Guptill's actions, the Town had an affirmative duty to take some form of remedial action.[5] The response of the Town's management in this case, though, was essentially to ignore Meadows' complaints. The workplace should be free from situations where employees must endure harassment until it has caused its harm and they can tolerate it no further.

For the foregoing reasons, the Town is liable to Meadows under Title VII for tolerating a hostile work environment. The only remaining issue is what damages Meadows can recover.

■ This court has held that because the Town properly terminated Meadows' employment for work-related reasons, the traditional Title VII remedies of backpay and reinstatement are inappropriate.[6] In the Civil Rights Act of 1991, however, Congress added a provision allowing a plaintiff in an action under Title VII to recover compensatory damages. *See* 42 U.S.C. § 1981a.[7] Thus, Meadows can recover damages from the Town for any emotional distress caused by the existence of the hostile work environment.

■ Meadows took tremendous pride in her work as Town Clerk, and was very satisfied with her job. But after Guptill began his harassment, Meadows was forced to spend her work days in apprehension of Guptill's visits. Meadows endured this hostile work environment from roughly December, 1986, until May, 1989—about seventeen months. She testified to embarrassment and humiliation by Guptill's actions. Seventeen months of almost daily embarrassment and humiliation would suggest a large award for Meadows' emotional harm.

Furthermore, after the death of her husband, Meadows was suffering from severe depression. While it is most likely that the initial cause of Meadows' depressive episode was the death of her husband, the continued existence of the hostile work environment substantially aggravated her suffering. Damages for aggravation of Meadows' existing emotional condition are recoverable in this action.

Fortunately for the Town, though, the Civil Rights Act of 1991 places a $50,000 cap on any award of compensatory damages against an employer of less than 100 persons. 42 U.S.C. § 1981a(b)(3)(A). The court is satisfied with Meadows' testimony that she was severely damaged emotionally by Guptill's repeated actions, and finds that Meadows damages for emotional distress caused by Guptill's sexual harassment exceed $50,000. Accordingly, the court will enter a judgment against the Town in the amount of $50,000.

## B. *Meadows' Claim Against Guptill for Battery*

■ A battery is a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact. *See* W. Page Keeton, *Prosser & Keeton on Torts* § 9, at 39 (5th ed. 1984).

■ Here, the court has found several instances of offensive touching which rise to the level of battery. Guptill frequently pat-

---

5. The Town argued in a previous motion that it could not be held liable for Guptill' actions because Guptill was an elected official, and the Town had no authority to discipline him. The court rejected this argument, holding that Title VII imposed a duty on the Town to at least try to alleviate the situation, even if there was no guarantee the Town could be successful. *See* Order dated April 9, 1993 at 5–6. Here, no Town official so much as even suggested to Guptill that his behavior may have been inappropriate.

6. *See* Order dated April 9, 1993.

7. Although this action was filed prior to the enactment of the Civil Rights Act of 1991, the Ninth Circuit has held that the courts are to apply the provisions of this Act retroactively to cases pending at the time of the legislation. *See Reynolds v. Martin*, 985 F.2d 470 (9th Cir.1993).

Punitive damages are also available to a plaintiff in an appropriate case, but not where the employer is a "political subdivision" such as the Town of Kearny. 42 U.S.C. § 1981a(b)(1).

ted Meadows on the rear end over a seventeen month period. One time he grabbed her buttocks with both hands. Also, several times in the hallway of the Town Hall, and once in the supply room, Guptill cornered Meadows and forced his body to press up against her body. Guptill's grabbing or tugging at Meadows' blouse also constitutes battery.

Guptill, though, argues that Meadows has not shown any damages attributable to Guptill's battery. The court disagrees. Meadows suffered both physical and emotional damages from each separate act of unwanted touching, however minimal. The court finds that Guptill's battery of Meadows on several occasions has damaged her in the amount of $2,500.

In addition, Meadows is entitled to punitive damages. Under Arizona law, a plaintiff can be awarded punitive damages upon a showing by clear and convincing evidence that the defendant's conduct was aggravated and outrageous, and that the defendant acted with an "evil mind." *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 331–32, 723 P.2d 675, 680–81 (1986). An evil mind can be shown by (1) intent to cause injury, (2) wrongful conduct motivated by spite or ill will, or (3) conscious pursuit of a course of conduct knowing that it created a substantial risk of harm to others. *Ranburger v. Southern Pacific Transp. Co.*, 157 Ariz. 551, 553, 760 P.2d 551, 553 (1988).

Here, Guptill, as a Town Council member, could vote to terminate Meadows long-standing employment for any reason. Guptill thus had the power to intimidate Meadows substantially. Guptill knowingly placed Meadows in a situation where her employment was jeopardized unless she tolerated his unwelcome comments and touching. Guptill harassed Meadows continually over a seventeen month period. He used his position of power to humiliate Meadows, and continued to do so even after he knew Meadows was grieving over the death of her husband. The court finds Guptill's conduct aggravated and outrageous, and also clear and convincing evidence that he was motivated by spite or ill will, and thus has an "evil mind"

under Arizona law. The court finds, therefore, that a substantial award of punitive damages is justified, and awards punitive damages against Guptill in the amount of $50,000.

## V. CONCLUSION

In accordance with the foregoing, it is hereby ORDERED that:

(1) The Town of Kearny is liable to Meadows under Title VII of the Civil Rights Act of 1964 in the amount of $50,000. Plaintiff also is entitled to an additional award of reasonable attorney's fees.

(2) Colin Guptill is liable to Meadows for battery in the amounts of $2,500 for compensatory damages, and $50,000 for punitive damages.

IT IS SO ORDERED.