Amna KADIKI, Plaintiff,

v.

**VIRGINIA COMMONWEALTH UNIVERSITY, Defendant.**

Civ. No. 3:94CV530.

United States District Court,
E.D. Virginia,
Richmond Division.

June 23, 1995.

As Corrected July 26, 1995.

·Carolyn Pullin Carpenter, Eileen N. Wagner, Carpenter, Woodward & Wagner, Richmond, VA, for plaintiff Amna Kadiki.

Paul Joseph Forch, Richard Croswell Kast, Office of Atty. Gen. of Va., David Lee Ross, Jean Freeman Reed, Virginia Commonwealth University, Richmond, VA, for defendant Virginia Commonwealth University.

## MEMORANDUM

MERHIGE, District Judge.

Amna Kadiki ("Plaintiff") alleges that Virginia Commonwealth University ("Defendant") discriminated against her on account of her sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. ("Title IX"). Plaintiff has moved for partial summary judgment and Defendant has moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

### I.

Plaintiff is a former student of Defendant Virginia Commonwealth University. As a student, Plaintiff enrolled in Biology 110, a course instructed by Associate Professor Michael Fine. On August 13, 1992, Plaintiff took a make-up biology examination, which Fine immediately evaluated. After reviewing the examination, Fine indicated that Plaintiff performed unsatisfactorily and that he would review the examination with her.

The two met alone in Fine's office. After reviewing Plaintiff's performance, it is undisputed that Fine placed Plaintiff over his knees and spanked her repeatedly with his hand because her score fell below a previously agreed-upon level. Complaint ¶ 14; Mem. in Support of Defendants Motion for Summary Judgment at 3; Fine Dep. at 62–68. The parties also agree that Fine told Plaintiff that she could retake the same examination the next day, but that she should bring a hairbrush with her and be prepared for an-

other spanking if she did not achieve or exceed a certain score. Complaint ¶ 13; Plaintiff Aff. ¶ 6; Mem. in Support of Defendants Motion for Summary Judgment at 4; see Fine Dep. at 155. Fine purportedly told Plaintiff that her spanking would be "worse" the second time around. Plaintiff Dep. at 25. After the incident, Plaintiff sought medical care for a sore buttocks. Plaintiff's Response to Defendant's Summary Judgment, Ex. A–1.

The same afternoon, Plaintiff's friend, Michael Casanovas, telephoned Fine in Plaintiff's defense. Plaintiff alleges that Fine offered her, through Casanovas, a grade of·"A" in Biology 110 if she first spoke with Fine before complaining of the spanking incident. Casanovas Aff. ¶ 9. Defendant, on the other hand, states that it was Casanovas who asked Fine to give Plaintiff a grade of "C" and bring the matter to an end. Fine Dep. at 76. Defendant also denies that Fine offered Plaintiff an "A" grade. See id. at 77.

Plaintiff soon commenced criminal and administrative proceedings against Fine. The criminal charges resulted in Fine's arrest and a November, 1992 conviction for misdemeanor assault. The administrative proceedings, which Plaintiff initiated by meeting with Dean of Students William Duvall, consisted of filing a charge with Dr. David Hiley, Dean of the College of Humanities & Sciences under Defendant's "Rules and Procedures" manual. After an investigation, Hiley concluded that Plaintiff's charges were valid and that Fine's actions were unprofessional, inappropriate and unacceptable. Complaint, Ex. B, Hiley Letter. Accordingly, Hiley placed Fine on probation, directed him to perform community service and recommended that he seek professional counseling. Id.; Mem. in Support of Defendant's Motion for Summary Judgment at 8.[1]

Soon after the aforementioned proceedings had been initiated, Associate Professor of Biology Jennifer Stewart, a colleague of

---

1. Testimony in the criminal matter and discovery in the instant matter have revealed that Fine spanked another female student several years prior to the instant matter. He has also threatened to do the same to other female students.

Fine Dep. at 24. These incidents were apparently unreported and thus unknown to Defendant. Moreover, Plaintiff does not allege that she was directly affected by these earlier events.

Fine's, urged Plaintiff to withdraw the criminal charge on the basis, *inter alia*, that Fine is "sensitive to the rights of women" and would neither disrespect women nor harass female students. Complaint, Ex. C, Stewart Letter. Plaintiff suggests that Defendant's officials asked Stewart to write this letter in an effort to resolve the situation. Defendant, however, indicates that Stewart wrote the letter without any encouragement from Defendant's officials.

From these allegations, Plaintiff pleads three causes of action under Title IX. First, she claims that Defendant created a hostile environment by subjecting her to unwelcome touching—the spanking. Second, plaintiff alleges *quid pro quo* harassment in that Fine (1) through a conversation with Casanovas, allegedly offered her an "A" grade in exchange for delaying or refraining from bringing charges against him, and (2) conditioned the retaking of the examination on a possible second spanking. Finally, Plaintiff claims that Defendant harassed and retaliated against her by pressuring her to withdraw the criminal charges through Professor Stewart's letter.[2]

Plaintiff moves for partial summary judgment on two issues. She first moves the Court to conclude that Fine's request that Plaintiff bring a hairbrush to the re-examination and subject herself to a possible second spanking constitutes an incident of *quid pro quo* harassment. Plaintiff also argues that Defendant is absolutely liable for any incidents of *quid pro quo* harassment. Defendant, on the other hand, moves for summary judgment as to all issues.

## II.

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. F.R.Civ.P. 56. Summary judgment is appropriate where parties do not dispute material facts that might affect the outcome of an action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under Rule 56, the movant bears the burden of proving the ab-

sence of any genuine issues of material fact, and the Court must view the facts and any justifiable and legitimate inferences drawn therefrom in the light most favorable to the non-moving party. *Id.* at 248, 255–56, 106 S.Ct. at 2510, 2513–14; *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985); *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). Once the movant has met this burden, and a properly supported motion is before the Court, a nonmoving party, who will bear the burden of proof at trial on a dispositive issue, may not rest upon mere belief or conjecture, or the allegations and denials contained in his pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rather, the non-moving party must set forth specific facts with affidavits, depositions, interrogatories or other evidence to show a genuine issue for trial. *Id.*

## III.

### A. Applicable standards in a Title IX case

 Title IX prohibits sex discrimination against students and employees of educational institutions that receive federal funds: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal funds." 20 U.S.C. § 1681(a). This statute carries an implied private right of action, *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and thus permits students to recover damages for discriminatory conduct engaged in by their professors. *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 75–76, 112 S.Ct. 1028, 1037–38, 117 L.Ed.2d 208 (1992).

While the Supreme Court has not expressly addressed whether Title IX actions are governed by Title VII standards, *Franklin,* 503 U.S. at 65 n. 4, 112 S.Ct. at 1032 n. 4, many lower courts have explicitly turned to Title VII and the broad body of related jurisprudence for guidance in Title IX cases,

---

**2.** Plaintiff initially complained of retaliatory conduct by a second professor. She indicates in her response to Defendant's summary judgment motion, however, that she is no longer pursuing that claim.

at least in the employment discrimination context. *E.g., Preston v. Comm'w of Va. ex rel. New River Community College,* 31 F.3d 203, 207 (4th Cir.1994); *Roberts v. Colo. State Bd. of Agric.,* 998 F.2d 824, 832 (10th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993) (same); *Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 896–97 (1st Cir.1988) (same).

Moreover, the *Franklin* court indicated that the overriding principle of Title VII, i.e., the elimination of discriminatory treatment, intimidation and scorn, should extend to Title IX actions brought by students (as opposed to employees). Specifically, in *Franklin,* respondent school and the United States argued that damages were an inappropriate remedy because Title IX was enacted under Congress' Spending Clause power. 503 U.S. at 74, 112 S.Ct. at 1037. The Supreme Court disagreed on the rationale that intentional sex discrimination does not raise the concern that the entity receiving federal funds lacks notice that it will be liable for an award of damages. *Id.* (*citing Pennhurst State Sch. and Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981)). The Court, quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986),[3] continued:

> Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal monies to be expended to support the intentional actions it sought by statute to proscribe.

*Franklin,* 503 U.S. at 75, 112 S.Ct. at 1037 (*quoting Meritor,* 477 U.S. at 64, 106 S.Ct. at 2404).

■ Finally, the Supreme Court has admonished that Title IX should be given "a sweep as broad as its language." *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982). On this basis, this Court concludes that Title VII standards and the judicial interpretations thereof "provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX," whether such action is brought by an employee or a student. *Preston,* 31 F.3d at 207; *e.g., Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir.1994) (*citing* 42 U.S.C. § 2000e-2(m)) (Title VII provides an analogy for student's Title IX action charging sex discrimination in defendant's disciplinary system).

## B. Sexual harassment

■ Sexual harassment is judicially recognized in two forms; Plaintiff seeks to recover under both theories. The first form, *quid pro quo* harassment, arises where a defendant's "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" are directly connected with the plaintiff's receipt of a job or education related benefit. *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404–05 (*quoting* 29 C.F.R. § 1604.11(a)). The second type of harassment occurs through the existence of an "offensive or hostile" environment. *Id.* at 64, 106 S.Ct. at 2404. The latter theory, however, is limited. Specifically, the environment must be more than subjectively hostile or abusive. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys.,* — U.S. —, — – —, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993); *accord Carter v. Ball,* 33 F.3d 450, 461 (4th Cir.1994); *Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir.), *vacated and remanded on other grounds,* 900 F.2d 27 (4th Cir.1990).

---

**3.** *Meritor* is a landmark sexual harassment case decided under Title VII. In affirming the Court of Appeals' determination that "unwelcome sexual advances that create an offensive or hostile working environment violate Title VII," the *Meri*-tor Court stated: "Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." 477 U.S. at 64, 106 S.Ct. at 2404.

### 1. Quid pro quo harassment

■ Plaintiff charges Defendant, through Fine, with two instances of *quid pro quo* sexual harassment. To set forth a cognizable claim under this theory, a plaintiff must establish the following elements:

1. The employee belongs to a protected group.

2. The employee was subject to unwelcome sexual harassment.

3. The harassment complained of was based upon sex.

4. The employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of prohibited criterion in making the employment decision.

5. The employer ... knew or should have known of the harassment and took no effective remedial action.

*Spencer v. General Elec. Co.*, 894 F.2d 651, 658 (4th Cir.1990). Where a supervisor engages in *quid pro quo* harassment, the fifth element is automatically satisfied. *Id.* at 658 n. 10.

### (a) Spanking and threatened spanking

There is no dispute that Plaintiff satisfies the first element of *quid pro quo* harassment. As to the second element, the nature of the act, the parties are in disagreement and the record does little to settle this difference of opinion. For example, Fine testified at his deposition that his conduct resulted from a paternal interest in Plaintiff's academic performance. Fine Dep. at 82; *see also id.* at 54–56. He also denied that his actions were sexual, and apparently indicated so in a discussion with his department head within a week of the incident. *Id.* at 72; Smock Dep.

at 32. Moreover, during his interview with Plaintiff, Dr. Hiley asked her whether she believed Fine's acts to be sexual, and Plaintiff allegedly replied "no." Hiley Dep. at 29. In fact, Plaintiff in her deposition repeatedly referred to the incident as only a "joke." Plaintiff Dep. at 27–29. Finally, Plaintiff did not pursue any action against Fine under the sexual harassment policy, but instead under Defendant's "Rules and Procedures" guidelines. *Id.* at 30.

On the other hand, Plaintiff adamantly maintains that Fine's conduct was sexual. *E.g.,* Plaintiff Dep. at 76; Plaintiff Aff. ¶ 14. As to her discussion with Dr. Hiley, Plaintiff testified that she did not recall whether he inquired as to her perceptions of the nature of Fine's acts. In response to a question as to why she did not tell Dr. Hiley that she believed it was a sexual act, Plaintiff replied:

> No. I just—it was something more of a mutual—that anyone would understand if I say the story, but I never mentioned it because I ... thought that this is something that he would know automatically of the nature of the subject. I didn't think that I would have to sit down and tell him that.

Plaintiff Dep. at 76. Moreover, Plaintiff states that Defendant did not apprise her that there was a separate policy and procedure regarding sexual harassment, Plaintiff Aff. at 15–16, and even Hiley admitted that he did not provide such information to Plaintiff. Hiley Dep. at 30.

Further facts suggesting that Fine's acts may have been sexual include the following: (1) Fine allegedly asked Plaintiff about her marriage plans and fiancee around the time of the spanking and re-examination offer; (2) Fine does not believe in spanking as a disciplinary measure for his own children; and (3) Fine, in the actual spanking incident, repeatedly touched a portion of Plaintiff's body generally regarded as private and erogenous. Given the disagreement between the parties and the factual contradictions in the record, the Court concludes that it cannot decide as a matter of law that Fine's actions either were or were not sexual in nature.

For the same reasons, the Court cannot decide the third *Spencer* element as a matter

of law. Specifically, while Defendant argues that Fine's actions were not motivated by gender, sufficient facts exist to permit a reasonable and justifiable inference to the contrary.

The parties also disagree as to the fourth element of the *quid pro quo* harassment analysis. Defendant argues that Plaintiff had no legitimate expectation to a re-examination and that, even if she did, Fine unconditionally allowed her to retake the examination. The record, however, is not as clear as Defendant proposes. Any student legitimately has a general expectation to complete a course in which he or she is enrolled. Such expectations, however, are largely shaped by the individual responsible for establishing the requirements and parameters of a college-level course—the professor. If a professor designates the taking of a re-examination as part of a student's course load, such re-examination, while not originally expected by the student, may be reasonably considered part of his or her general expectation in satisfactorily completing the course. In this sense, a reasonable inference exists that Plaintiff was "qualified to receive" the re-examination. *Spencer*, 894 F.2d at 658.

The Court is also not persuaded, as a matter of law, that Fine unconditionally allowed Plaintiff to take the re-examination, as Defendant proposes. While Fine undoubtedly offered Plaintiff the opportunity to retake the examination, a fact finder could readily conclude that he also attached a condition to the taking of such test. Specifically, there are sufficient facts in the record for one to reasonably and justifiably determine that Fine offered, and Plaintiff agreed to, the retest on the condition that she bring a hairbrush and acquiesce to a second spanking in the event she did not attain or exceed an agreed-upon score.

■ Finally, the Court concludes that the fifth element is automatically satisfied in this matter. Indeed, a professor is authorized by his educational employer to design the curriculum and manage the classroom. For example, a professor is responsible for selecting material for daily study, guiding class discussion, setting assignments, administering examinations and overseeing student behavior. Given these job characteristics, a professor is analogous to a work place supervisor, and knowledge of any *quid pro quo* harassment of a student by a professor should be imputed to his employer. *Cf. Spencer*, 894 F.2d at 658 n. 10. Of course, such knowledge can only be imputed where the harassment occurs as part of the professor's professorial responsibilities.

■ On this basis, the Court determines that a reasonable trier of fact may conclude that Fine's conduct with respect to the re-examination constitutes an incident of *quid pro quo* harassment. At the same time, a reasonable fact finder, for any number of reasons, could also reach the opposite conclusion. Accordingly, both Plaintiff's and Defendant's motions for summary judgment as to this issue will be denied.

**(b) Casanovas conversation**

■ As an alleged second incident of *quid pro quo* harassment, Plaintiff asserts that Fine, through his telephone conversation with Casanovas, offered Plaintiff an "A" grade "if she would first come talk to Fine before making any complaints about the incident." Complaint ¶ 19. Complaint ¶ 43. Even if this allegation is true, which the parties dispute, such conduct was manifestly non-sexual and cannot be considered an incident of *quid pro quo* harassment. Accordingly, Defendant's motion for summary judgment must be granted as to this claim of *quid pro quo* harassment.

**2. Hostile environment harassment**

■ Plaintiff's also charges Defendant with intentionally creating a hostile environment "by subjecting the Plaintiff to unwelcome touching of a sexual nature by a VCU faculty member." Complaint ¶ 41. The primary facts in support of this claim include the August 13, 1992, spanking administered by Fine and his suggestion that an unacceptable result on the re-examination could result in a second spanking. After the spanking, Plaintiff did not want to see Fine again and was permitted to withdraw retroactively from Biology 110 and re-enroll the following fall term. She also states, *inter alia*, that

she is reluctant to enter the life sciences building, avoids classes taught by male professors and refrains from identifying herself in class. Plaintiff Aff. ¶¶ 20–24.[4]

The Fourth Circuit has established a two step analysis for establishing a cause of action for hostile environment. First, to be actionable, an educational environment must exhibit " 'discriminatory intimidation, ridicule, and insult' that is sufficiently severe or pervasive to alter the conditions" of the plaintiff's education or create an abusive atmosphere. *Harris,* —— U.S. at ——, 114 S.Ct. at 370. A cause of action for hostile educational environment will not lie where the acts complained of are "isolated or genuinely trivial." *Carter,* 33 F.3d at 461 (emphasis added) (*citing Katz v. Dole,* 709 F.2d 251, 255 (4th Cir.1983); *Strickland v. Sears, Roebuck and Co.,* 693 F.Supp. 403, 405 (E.D.Va. 1988)). Second, the plaintiff "must demonstrate that the employer either knew or should have known" of the allegedly hostile environment *and* "took no prompt and adequate remedial action." *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987) (*citing Katz,* 709 F.2d at 255).

In the instant matter, the Court determines, as a matter of law, that Plaintiff has failed to establish a claim of hostile environment harassment. To begin, the Court is not convinced that the conduct complained of was sufficiently pervasive to satisfy the first prong of the *Katz* test. *See Carter,* 33 F.3d at 461; *Strickland,* 693 F.Supp. at 405. The Court will not decide that specific issue, however, because a more compelling fact warrants summary judgment on this issue. Specifically, the record unequivocally reveals that Defendant, through the actions of Duvall and Hiley, *immediately* investigated Plaintiff's complaint and, within one month of the subject spanking and threatened second spanking, imposed a variety of sanctions on Fine. *See* Deps. of Duvall, Hiley & Smock;

Complaint, Ex. B.[5] Because Defendant took "prompt and remedial action" with respect any conduct that involved Plaintiff, Plaintiff cannot prevail on her theory of hostile work environment harassment. *Swentek,* 830 F.2d at 558; *see e.g., Strickland,* 693 F.Supp. at 405 (Title VII); *see also Dennis v. County of Fairfax,* 55 F.3d 151, 155 (4th Cir.1995) (§ 1981 racial harassment claim; "where an employer implements timely and adequate corrective measures after harassing conduct has come to its attention, vicarious liability [for hostile work environment] should be barred regardless of the specific motivation for the wrongdoing or the particular cause of action"). Accordingly, Defendant's motion for summary judgment, to the extent it challenges Plaintiff's hostile environment claim, will be granted.

### 3. Retaliation

 Plaintiff claims that Defendant, through Professor Stewart, harassed and retaliated against her because she filed criminal charges against Fine. Stewart is responsible for sending a letter to Plaintiff in which Stewart expressed the "hope that you will consider ending additional court proceedings" against fine. Complaint, Ex. C. Stewart also stated that Fine is not the type of person to harass women. Again, such conduct simply does not rise to the level of harassment or retaliation. There is no evidence in the record even suggesting that Stewart was retaliating against Plaintiff for pursuing charges against Fine. Indeed, Stewart, more than anything else, was seemingly sharing her opinion of a colleague with another woman. The Court thus concludes that Plaintiff's claims of harassment and retaliation must fail as a matter of law, and will enter summary judgment in Defendant's favor as to this specific issue.

---

4. Plaintiff also seems to rely on Fine's admission that he previously spanked and/or threatened to spank other female students. Plaintiff, however, fails to state how these incidents impacted *her* educational experience; thus, these facts provide only marginal support for a hostile environment claim. *See White v. Federal Express Corp.,* 939 F.2d 157, 161 (4th Cir.1991) (where racial incidents largely involved other employees, plaintiff

had no harassment cause of action under Title VII).

5. Moreover, Defendant promptly instituted additional charges against Fine upon his revelation that he spanked a second student several years earlier. Hiley Aff.

## C. Defendant's scope of liability for quid pro quo harassment

 The Court has heretofore concluded that knowledge of *quid pro quo* harassment may be imputed to a university/employer where a professor is responsible for the harassing conduct. *See supra* Section III. B.1.a. In such cases, the university/employer is "automatically liable" for the harassment. *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1351 n. 3 (4th Cir.1995) (Title VII case) (*citing Spencer*, 894 F.2d at 658 n. 10). As stated in *Lipsett*:

> By referring with approval to the argument in the *amicus curiae* brief of the EEOC, [the Supreme Court] implicitly left intact the standard developed in the lower courts applicable to claims of quid pro quo sexual harassment and discriminatory discharges. Under this standard, an educational institution is absolutely liable [under Title IX] for such acts "whether or not [i]t knew, should have known, or approved of the supervisor's actions."

864 F.2d at 901 (*quoting Meritor*, 477 U.S. at 70–71, 106 S.Ct. at 2407).

Defendant, citing *Howard v. Bd. of Educ. of Sycamore Community Unit School Dist. No. 427*, 876 F.Supp. 959 (N.D.Ill.1995), argues that strict liability principles do not apply in Title IX actions. In *Howard*, the court concluded that the defendant school board could be held liable for the actions of a high school principal only if it had actual knowledge of, or participated in, the discriminatory conduct. The court premised this holding on a determination that Title IX differed from Title VII in that the latter expressly defines "employer" to include "any agent of such a person" while the former fails to encompass agents within the interpretation of "program or activity." 876 F.Supp. at 974.

 Defendant's reliance on *Howard* is misplaced. To begin, the *Howard* court was not directly addressing the scope of liability for *quid pro quo* harassment. Second, and more importantly, the *Howard* court interpreted the definition of "program or activity" in an exceedingly narrow fashion. Indeed, Congress, in interpreting "program or activity" as "all the operations of . . . a college [or] university," 20 U.S.C. § 1687,[6] admonished that Title IX be accorded a "broad, institution-wide application" and expressed a concern that this "broad application" had been "unduly narrowed" by recent court opinions. Pub.L. No. 100–259, § 2, 102 Stat. 28 (1988).[7] Thus, where any operation of a university has a discriminatory impact on a student or group of students, Congress has decisively concluded that Title IX must be broadly interpreted to prohibit such discrimination as long as "any part" of the university "is extended federal assistance." 20 U.S.C. § 1687. Indeed, the overriding objective of Title IX, seemingly overlooked by the *Howard* court, is to prevent the use of federal resources to support any form of discrimination, based upon gender. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956–57, 60 L.Ed.2d 560 (1979). Given the purpose of Title IX and Congress' mandate that Title IX be broadly interpreted, it is essentially inconsequential that Title IX does not expressly adopt agency principles.

 This conclusion is neatly illustrated by the case at bar. The academic aspects of a university, including the administration of examinations and the assignment of grades, are quintessential university "operations." Authority to manage these "operations" is primarily delegated to professors. Where a professor exploits his authority over these "operations" to engage in discriminatory behavior, Title IX must be available to impose liability on his employer or Congressional intent would plainly be thwarted. *See Lip-*

---

6. Congress amended Title IX through the Civil Rights Restoration Act of 1987. In particular, Title IX was amended to include a section entitled "Interpretation of 'Program or Activity.'" Civil Rights Restoration Act of 1987. Pub.L. No. 100–259, § 3(a), 102 Stat. 28, 28–29 (1988). This section, now codified at 20 U.S.C. § 1687, was unequivocally fashioned to restore the broad scope of Title IX coverage.

7. Congress was particularly concerned with the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), in which the Court severely limited the applicability of Title IX by narrowly interpreting the "program or activity" language of the statute.

*sett,* 864 F.2d at 901 (university may be held vicariously liable under Title IX). This Court has heretofore concluded that Title VII standards apply to private causes actions under Title IX; thus, where a professor engages in *quid pro quo* harassment, a university may be held strictly liable. *See Martin,* 48 F.3d at 1351 n. 3 (Title VII case).

In summary, should a trier of fact determine that Fine's conduct constituted *quid pro quo* harassment, Defendant must be held strictly liable. Indeed, Fine's actions occurred at school during school hours and directly involved a student whom Defendant authorized Fine to teach and administer examinations.[8]

An appropriate Order shall issue.

## ORDER

This matter is before the Court on cross-motions for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56. Upon due consideration, for the reasons stated in the accompanying Memorandum this date filed, and deeming it just and proper so to do, it is ADJUDGED and ORDERED as follows:

(1) Defendant's motion for summary judgment, to the extent that it seeks a determination that Fine's conduct was not an act of sexual harassment, be and the same is hereby DENIED;

(2) Defendant's motion for summary judgment, to the extent that it seeks a determination that Fine's conduct concerning the re-examination did not constitute an incident of *quid pro quo* harassment, be and the same is hereby DENIED;

(3) Defendant's motion for summary judgment, to the extent that it seeks a determi-

nation that the circumstances concerning Fine's conversation with Casanovas did not constitute an incident of *quid pro quo* harassment, be and the same is hereby GRANTED;

(4) Defendant's motion for summary judgment, to the extent that it seeks a determination that it cannot be held strictly liable for an act of *quid pro quo* harassment, be and the same is hereby DENIED;

(5) Defendant's motion for summary judgment, to the extent that it seeks a determination that the conduct of Professor Stewart did not constitute harassment and retaliation, be and the same is hereby GRANTED;

(6) Defendant's motion for summary judgment, to the extent that it seeks a determination that Plaintiff has failed to establish a cause of action for hostile environment harassment, be and the same is hereby GRANTED;

(7) Plaintiff's motion for partial summary, to the extent that it seeks the Court to rule that Fine's conduct concerning the re-examination constituted an incident of *quid pro quo* harassment, be and the same is hereby DENIED;

(8) Plaintiff's motion for partial summary, to the extent it seeks a ruling that Defendant is absolutely liable for incidents of *quid pro quo* harassment and assuming that a finder of fact concludes that Fine's conduct concerning the re-examination may be so characterized, be and the same is hereby GRANTED.

---

**8.** In so holding, the Court does not agree with Defendant that *Hastings v. Hancock,* 842 F.Supp. 1315 (D.Kan.1993), compels the opposite result. In *Hastings,* the plaintiff instituted an action under Title IX for harassing conduct by the director of a hairstyling school. In a footnote, the Court decided that *Meritor* dictated that *quid pro quo* claims and hostile environment claims "should be treated the same so far as establishing liability on the part of the employer/institution." 842 F.Supp. at 1318 n. 2. This Court respectfully disagrees with this interpretation of *Meritor.* As stated heretofore, the *Meritor* court implicitly agreed with both the EEOC's view that knowl-

edge of a supervisor's conduct can be imputed to an employer in non-hostile work environment cases *and* the courts' resulting imposition of strict liability on employers in such cases. 477 U.S. at 70–71, 106 S.Ct. at 2407–08.

Nor is the Court persuaded by Defendant's argument that "academic freedom" requires a relaxation of the general rule that an employer be held strictly liable for *quid pro quo* harassment. Academic freedom, while intended to encourage creativity, should never be used to shield illegal, discriminatory conduct. Any suggestion to the contrary would contravene Congress' intent in enacting Title IX.