**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 95-50791**
_____

**CANUTILLO INDEPENDENT SCHOOL DISTRICT,**

**Defendant-Appellant,**

**versus**

**MARTHA LEIJA and JERRY LEIJA**
**as next friends of ROSEMARIE LEIJA, a minor,**

**Plaintiffs-Appellees.**

_____

**Appeal from the United States District Court**
**for the Western District of Texas**

_____

November 16, 1996

Before GARWOOD, BARKSDALE, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

This interlocutory appeal by the Canutillo Independent School District turns on whether, under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 _et seq._, a school district is strictly liable for its teacher's sexual abuse of a student; and, if not, whether another teacher's being told about the abuse is sufficient notice to the school district for possible liability under some other standard.  We **REVERSE** the denial of the school district's motion for judgment as a matter of law on the Title IX claim and **REMAND**.

The school district is located in Canutillo, Texas, and receives federal financial assistance. At the Canutillo Elementary School, Rosemarie Leija was assigned in 1989 to the second-grade homeroom class of Pam Mendoza and the physical education/health class of Tony Perales.

Perales' classes were a part of the daily curriculum. Once a week, he taught health, which consisted primarily of showing movies to his students in a darkened classroom. Throughout the 1989-90 school year, Perales sexually molested Leija during these showings. One of Leija's classmates testified that, during this same time period, she was also molested in a similar manner by Perales.

In early 1990, Leija and the other student told Mendoza about some of Perales' actions. Mendoza spoke with each of the girls individually and told them to avoid Perales. Mendoza talked to Perales about the accusations, but she did not advise anyone else, such as the superintendent or principal. Later that spring, Leija told her mother that Perales had been touching her. Leija's mother discussed the matter with Mendoza at one of the regularly scheduled parent-teacher conferences, and Mendoza told her that she would look into the matter. Leija's mother did not discuss this with anyone other than her husband. According to Leija, Mendoza confronted her after the conference and threatened her with "trouble" if she was lying about her accusation.

Afterwards, Leija did not speak with anyone about the abuse until she began counseling sessions in 1993. Her parents, as next friends, then filed this action against the school district (CISD) and Perales under Title IX and under 18 U.S.C. § 1983. Summary judgment was granted CISD on the § 1983 claim.

During the trial of the Title IX claim, at the close both of Leija's case and of all the evidence, CISD moved for judgment as a matter of law on the basis that, *inter alia,* Leija had not produced evidence of discriminatory intent on its part. Both motions were denied, and the special interrogatories given the jury premised CISD's liability instead on a "negligent agent" theory:

> Did Pam Mendoza, as an agent of [CISD], know or, in the exercise of reasonable care, should she have known, of the sexual harassment or abuse by Tony Perales against Rosemarie Leija?
>
> Did Pam Mendoza take the steps a reasonable person would have taken under the same or similar circumstances to halt the sexual harassment or abuse by Tony Perales against Rosemarie Leija?

The jury returned a verdict for Leija, awarding $1.4 million in compensatory damages.

Post-verdict, CISD again sought judgment as a matter of law and moved, in the alternative, for remittitur. Among other things, it again maintained that Leija had not shown intentional discrimination on its part. In denying the motion, the district court changed course and held, in a most comprehensive opinion,

- 3 -

that its instructions on liability were unnecessary because CISD was instead strictly liable for Perales' actions. 887 F. Supp. 947, 953 (W.D. Tex. 1995). However, because the court was concerned that Title IX strict liability might expose school districts to "potential insolvency", it held also that damages should be limited to expenses for medical and mental health treatment and for special education. *Id.* at 956. And, because the damages special interrogatory was not so limited, the court treated CISD's remittitur motion as one for a new trial on damages and granted it. *Id.* at 957. The court later certified its order under 28 U.S.C. § 1292(b) for immediate appeal, and this court granted CISD leave to do so.

## II.

Although CISD presents several points, this interlocutory appeal turns on whether the liability standard under Title IX for teacher-student sexual abuse is strict liability; and, if it is not, whether the notice to Mendoza, a teacher, is sufficient to hold the school district liable. In so deciding, we review *de novo* the denial of CISD's motion for judgment as a matter of law, using the same standards as those applied by the district court. *E.g., Conkling v. Turner*, 18 F.3d 1285, 1300-01 (5th Cir. 1994). Such judgment is appropriate if, after viewing the record in the light most favorable to the nonmovant, there is no "legally sufficient

evidentiary basis" for a reasonable jury to have found for the prevailing party. *Id.* (quoting FED. R. CIV. P. 50(a)).

Title IX provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a). There is an implied right of action under Title IX in favor of victims of discrimination on the basis of sex, *Cannon v. University of Chicago*, 441 U.S. 677, 709 (1979), and monetary damages may be awarded for its intentional violation, *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 74-76 (1992).

For purposes of this appeal, we assume that discrimination "on the basis of sex" includes sexual abuse of a student by a teacher. *See id.* at 75. CISD, unlike the *amici*, does not contend otherwise. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 477 (5th Cir.) (en banc) (Jones, J., dissenting) (citing *Franklin* for proposition that school accepting federal funds "render[s] itself potentially liable" to Title IX claims for teacher-student sexual harassment), *cert. denied sub nom. Lankford v. Doe*, 115 S. Ct. 70 (1994). *But see Franklin*, 503 U.S. at 62-63 (limiting question presented to "whether the implied right of action under Title IX ... supports a claim for monetary damages"); *Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1011 n.11 (5th Cir. 1996) ("[A]ny language in

*Franklin* regarding teacher-student sexual harassment is pure *dictum.*"), *cert. denied*, 65 U.S.L.W. 3033 (U.S. Oct. 7, 1996) (No. 96-4).

### A.

The district court was the first to adopt strict liability as the standard for school district Title IX liability for teacher-student sexual abuse.  Three other standards have been utilized.  We summarize them briefly before addressing, and rejecting, strict liability.

### 1.

The three approaches generally followed are those used for Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*; for Title VII of that Act, 42 U.S.C. §§ 2000 *et seq.*; and pursuant to *Restatement (Second) of Agency §* 219.

### a.

CISD urges that Leija must prove that the school district itself engaged in intentional sex-based discrimination.  Its basis is the statement in **Cannon** that Title IX was "patterned" after Title VI.  **Cannon**, 441 U.S. at 694.  As the Court noted, "the two statutes use identical language to describe the benefited class", *id.* at 694-95.  Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance." 42 U.S.C. § 2000d. Both statutes also utilize a similar "administrative mechanism" to terminate financial assistance to recipients "engaged in prohibited discrimination". *Cannon*, 441 U.S. at 695-96.

Moreover, our court recently described Title VI as the "model" for Title IX. *Rowinsky*, 80 F.3d at 1012 n.14. And, in *Chance v. Rice University*, 984 F.2d 151, 153 (5th Cir.), *reh'g denied*, 989 F.2d 179 (5th Cir. 1993), a district court's application of Title VI standards to a Title IX claim was not held erroneous. *Chance*, however, involved a claim of discrimination in the promotion and compensation of professors at a university, not teacher-student sexual abuse; furthermore, an imputed liability standard was not at issue. 984 F.2d at 152.

To receive compensatory damages, a Title VI plaintiff must prove discriminatory intent. *Guardians Ass'n v. Civil Serv. Comm'n of the City of New York*, 463 U.S. 582, 584 (1983); *id.* at 608 n.1 (Powell, J., concurring); *see Franklin*, 503 U.S. at 70. Consequently, CISD asserts that it cannot be liable absent proof that it actually participated in Perales' discriminatory conduct. *See, e.g.*, *Seamons v. Snow*, 864 F. Supp. 1111, 1117 (D. Utah 1994), *aff'd in part and rev'd in part*, 84 F.3d 1226 (10th Cir. 1996); *R.L.R. v. Prague Pub. Sch. Dist. I-103*, 838 F. Supp. 1526, 1534 (W.D. Okla. 1993).

b.

Leija also disclaims the district court's strict liability/limited damages approach. Leija asserts that Title VII liability principles should govern instead. The basis for this approach is the *Franklin* Court's reliance on *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986), a Title VII case, in stating that

> [u]nquestionably, Title IX placed on the Gwinnett County Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986).* We believe the same rule should apply when a teacher sexually harasses and abuses a student.

*Franklin*, 503 U.S. at 75.

Under Title VII, the standard for an employer's liability for an employee's conduct depends on the type of sexual harassment at issue. Courts have held an employer strictly liable for "*quid pro quo*" harassment (receipt of a benefit conditioned on submission to sexual conduct). *See Meritor*, 477 U.S. at 70-71; *Henson v. City of Dundee*, 682 F.2d 897, 910 (11th Cir. 1982). However, for "hostile environment" harassment (sexual conduct which, *inter alia*, creates an intimidating working environment), an employer is liable only if it knew, or should have known, of that conduct and did not take appropriate remedial action. *Nichols v. Frank*, 42 F.3d 503, 508

(9th Cir. 1994); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1016 (8th Cir. 1988).

The district court instructed the jury only on a hostile environment theory; it refused to instruct on a *quid pro quo* theory. We agree that the abuse in issue is the former, not latter, type. Under these principles for hostile environment claims, CISD could be liable if, *inter alia*, it had actual or constructive notice of Perales' actions. *See Kinman v. Omaha Pub. Sch. Dist.*, 94 F.3d 463, 469 (8th Cir. 1996); *Preston v. Commonwealth of Va. ex rel. New River Community College*, 31 F.3d 203, 206-07 (4th Cir. 1994).

## c.

As a variation on *respondeat superior*, the *Restatement (Second) of Agency* § 219 provides a third possible liability standard:  a master is not liable for his servant's torts committed outside the scope of employment unless "the master was negligent or reckless".  *Restatement (Second) of Agency* § 219(2)(b) (1957). Under this standard, and because the sexual abuse was not within the scope of Perales' employment as a teacher, CISD would be liable for his actions only if it failed to use reasonable care in preventing, or failing to remedy, a problem that it knew, or should have known, existed.  *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 577 (10th Cir. 1990) (interpreting § 219 in Title VII case); *see Rosa H. v. San Elizario Indep. Sch. Dist.*, 887 F. Supp.

- 9 -

140, 142-43 (W.D. Tex. 1995); *Hastings v. Hancock*, 842 F. Supp. 1315, 1319 (D. Kan. 1993).

2.

Rejecting the foregoing approaches, the district court adopted strict liability as the Title IX liability standard for teacher-student sexual abuse. 887 F. Supp. at 954. As noted, it did not do so until *after* the jury rendered its extremely large compensatory damages verdict. *Id.* at 948. No court had previously adopted this approach in imputing liability to a school district for a Title IX hostile environment claim. Moreover, subsequent to the district court rendering its opinion, only one other court has followed suit. *Bolon v. Rolla Pub. Sch.*, 917 F. Supp. 1423, 1427-28 (E.D. Mo. 1996). That court also certified its order for interlocutory appeal. *Id.* at 1433-34.

In the case at hand, the district court opined that a student would have difficulty meeting any of the usual liability standards because most sexual abuse "occurs or at least is attempted under cover of secrecy"; and that, "unless the acts of the employees of the district are fully and strictly imputed to the district, Title IX becomes potentially inoperative." 887 F. Supp. at 953. Because of this proof problem, and because "the risk of harm is better placed on a school district than on a young student", the court held CISD strictly liable for Perales' sexual abuse of Leija. *Id.*

at 955. For the following reasons, we reach the opposite conclusion.

Our court explained recently that "precedent strongly suggests" that Congress enacted Title IX pursuant to its Spending Clause power, U.S. CONST. art. I, § 8, cl. 1, and not § 5 of the Fourteenth Amendment. *Rowinsky*, 80 F.3d at 1012 n.14. Although the *Franklin* Court had earlier refused to decide this issue, *Franklin*, 503 U.S. at 75 n.8, our court gave cogent reasons for interpreting Title IX in the same way Title VI is interpreted, as Spending Clause legislation, including the identical language of the two statutes, the fact that Title IX was modeled after Title VI, and the Supreme Court's traditional hesitance to "attribut[e] Congressional intent to act under its authority to enforce the Fourteenth Amendment." *Rowinsky*, 80 F.3d at 1012 n.14 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)).

In *Pennhurst,* 451 U.S. at 17, the Court described the typical spending power statute as a contract: "[I]n return for federal funds, the States agree to comply with federally imposed conditions". But, Congress must be clear and "unambiguous[ ]" about any conditions or obligations it is imposing on the recipient of such funds. *Id.* As the *Pennhurst* Court explained, "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* Thus, in *Pennhurst*, a

general statement of legislative findings characterized as a "bill of rights" in the statute was insufficient to impose enforceable obligations on participants in a Spending Clause program. *Id.* at 18-27.

Assuming, *arguendo*, that Title IX is a Spending Clause statute, Congress must be unambiguous in expressing to school districts the conditions it has attached to the receipt of federal funds. Nothing in the statute, however, places a school district on notice that it will be strictly liable for its teachers' criminal acts. In fact, the conditions Congress imposed on Title IX recipients are limited to those anti-discrimination factors found in its sparse wording; there is no mention of liability standards, such as intent, actual knowledge, gross negligence, or lack of due diligence, let alone the imposition of liability without fault. 20 U.S.C. § 1681.

It would be difficult to conclude that Title IX, which contains no whisper of strict liability, creates this enforceable obligation, whereas the provision at issue in **Pennhurst**, which was part of the text of the statute, did not. **Pennhurst**, 451 U.S. at 13-14, 18-27. And, if strict liability were the standard, it cannot be that a school district that chooses to accept federal monies can be said to have made a "knowing[ ]" choice, "cognizant of the consequences of [its] participation", when the statute governing the receipt of those funds is completely silent about a

financially devastating consequence of that participation. Simply put, strict liability is not part of the Title IX contract.

In addition, there is no sound policy reason to hold a school district financially accountable, through strict liability, for the criminal acts of its teachers. As noted, in recasting an argument frequently made in support of imposing strict liability on product manufacturers, *see, e.g.,* **Greenman v. Yuba Power Products, Inc.**, 377 P.2d 897, 901 (Cal. 1963); **Escola v. Coca-Cola Bottling Co.**, 150 P.2d 436, 440-41 (Cal. 1944) (Traynor, J., concurring), the district court explained that "the risk of harm is better placed on a school district than on a young student." 887 F. Supp. at 955.

But, along this same line, one reason courts and state legislatures have so allocated risk to product manufacturers is because they are better able to spread liability costs among consumers by raising the price of their products. *E.g.*, **Escola**, 150 P. 2d at 441 (Traynor, J., concurring). A school district should not be required to perform a comparable task, even if it could. A school district's "products" are its students; there is no "price" to raise. Instead, public schools are funded typically by a combination of federal and state funds and property taxes levied by the local governing body. We refuse to impose the necessity of a "Title IX assessment" in order to spread the risk of million-dollar verdicts. As horrible a crime as child abuse is, we do not live in a risk-free society; it contorts "public policy" to

suggest that communities should be held financially responsible in this manner (strict liability) for such criminal acts of teachers.

Continuing with this product manufacturer analogy, another reason behind product manufacturer strict liability is that the manufacturer is in a better position than a consumer to search for and discover defects in design or manufacture. *See*, *e.g.,* **Escola**, 150 P.2d at 440-41 (Traynor, J., concurring). But, there is no product for a school district to design, test or inspect. Again, its "products" are its students; they are not the offending item. And, just as is a product manufacturer, a school district is limited in what it can prevent through careful screening and monitoring of its employees, both before and after hiring them. Human beings are inherently unpredictable, making it impossible for a school district to discover potential human "defects" the way, for example, that a manufacturer, for its products, can design against defects, or inspect for them on an assembly line. In addition, the Constitution and state and federal law limit the extent to which a school district can examine, inquire about, or investigate its employees and their backgrounds and characteristics.

Likewise, as the district court noted, teacher-student sexual abuse is conducted in secret, making it difficult, if not impossible, to detect without being told about it. Obviously, immediate and adequate notice is one of the best means of stopping

abuse and removing (*and convicting*) the abuser.  In fact, as a matter of public policy, it may well be that requiring knowledge by the school district, often acquired by being told about such abuse, as a condition to recovery of damages will result in much quicker and greater protection not only to the person being abused and providing notice, or on whose behalf it is given, but will also better protect or otherwise benefit those who may then be undergoing abuse from that, or another, teacher.  This additional benefit applies equally to those who might be otherwise subject to abuse in the future from that teacher, as well as from others.

The district court suggests that strict liability will "heighten[ ] the vigilance of the district and cause[ ] employees at all levels of the system to be alert to the problem."  887 F. Supp. at 955.  It is difficult to believe, following lengthy and nationally publicized child abuse trials, the otherwise heightened awareness of child abuse, and the increased filings of Title IX actions for student abuse, that any school district or teacher is not already extremely alert to the problem of teacher-student sexual abuse.  But in any event, as explained, such vigilance, alertness, and awareness are insufficient to shield a school district from potential financial ruin under the district court's strict liability approach, even with the limited damages it couples to that standard.  Strict liability converts the school district from being the educator of children into their insurer as well.

And, if it is their insurer, it is most arguable that its role as educator -- needed now more than ever -- will suffer, and suffer most greatly.

It is true that the Supreme Court has found an implied private cause of action in Title IX, even though the statute is silent. *Cannon*, 441 U.S. at 709. And, it is also true that the Court discerned an intent on the part of Congress to provide all appropriate remedies for a Title IX violation, although the statute makes no mention of them. *Franklin*, 503 U.S. at 71-75. But, strict liability is a step too far; we will not take it.

### B.

As discussed *infra*, and based on the facts in this case (especially because the only notice was to another teacher), it is not necessary now to move beyond our rejection of strict liability and adopt a liability standard for Title IX cases of the type at hand. Leija's Title IX claim fails under each of the three types commonly applied.

### 1.

Of course, if the appropriate standard were analogous to Title VI, even notice, absent direct involvement by the school district, would not impute liability to the district. *See* *R.L.R.*, 838 F. Supp. at 1534. It is undisputed that there was no such involvement by CISD. Therefore, the Title IX claim would fail under this standard. We turn to how it would fare under a liability standard

- 16 -

akin to Title VII or § 219 of the *Restatement (Second) of Agency*. (Needless to say, the brevity of this Title VI analogy, especially as compared to the length of the discussion that follows, should not be understood to mean that, for purposes of this opinion, we view it as having less validity than those other two standards.)

2.

Under the standard for Title VII or § 219, a school district would be liable if it knew, or should have known, of the teacher's conduct and failed to take remedial action. *See* **DeAngelis v. El Paso Mun. Police Officers Ass'n**, 51 F.3d 591, 593 (5th Cir.) (Title VII), *cert. denied*, 116 S. Ct. 473 (1995); **Hirschfeld**, 916 F.2d at 577 (§ 219). Restated, under either standard, actual or constructive notice, *inter alia*, would constitute a sufficient basis for Title IX liability. Both CISD and Leija agree on this point.

a.

Therefore, under either standard, the question then becomes: To whom must such notice be given? CISD asserts that, at the least, a management-level employee must have notice of the teacher's actions. Leija counters that, as long as the student reports the actions to someone "appropriate" to receive the complaint, the notice element has been satisfied.

In the Title VII context, our court has explained that an employer has *actual* notice of harassment when an employee complains

- 17 -

to "higher management". ***Waltman v. International Paper Co.***, 875 F.2d 468, 478 (5th Cir. 1989); *see also **Nash v. Electrospace Sys., Inc.***, 9 F.3d 401, 404 (5th Cir. 1993) (discussing failure of plaintiff to complain to "company hierarchy"). A Title VII plaintiff can show *constructive* notice by "showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge". ***Waltman***, 875 F.2d at 478 (quoting ***Henson***, 682 F.2d at 905). (As discussed *infra,* there is no evidence that, at the time of the assaults on Leija, Perales' conduct was so pervasive that a reasonable juror could infer that CISD had knowledge of the situation.)

Other circuits have adopted a similar definition for Title VII *actual* notice. ***Nichols***, 42 F.3d at 508 ("The proper analysis for employer liability in hostile environment cases is what management-level employees knew or should have known...."); ***Hall***, 842 F.2d at 1015-16 (explaining that employer had actual notice because foreman was told of harassment); ***Katz v. Dole***, 709 F.2d 251, 255-56 (4th Cir. 1983) (describing personnel that put employer on notice of harassment as "supervisory"); ***Henson***, 682 F.2d at 905 ("The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management....").

Likewise, under § 219, courts require that a plaintiff notify management-level employees before an employer can be said to have

actual knowledge. *See* **Hirschfeld**, 916 F.2d at 577 (citing **EEOC v. Hacienda Hotel**, 881 F.2d 1504, 1516 (9th Cir. 1989)).

There is no reason to define actual notice differently in the Title IX context. In fact, the one Title VII case cited by Leija to support her "appropriate employee" contention described the personnel that the plaintiff notified as "supervisory". **Llewellyn v. Celanese Corp.**, 693 F. Supp. 369, 380 (W.D.N.C. 1988). Moreover, it makes little sense, on the one hand, to make liability contingent, *inter alia*, on whether the employer (school district) takes "prompt remedial action", *see* **DeAngelis**, 51 F.3d at 593, yet, on the other hand, define "employer" so broadly as to include personnel who have no authority to take such action. Therefore, before the school district can be held liable under Title IX for a teacher's hostile environment sexual abuse, someone in a management-level position must be advised about (put on notice of) that conduct, and that person must fail to take remedial action.

For purposes of this appeal, we need not decide, and thus leave for another day, the question of whether the appropriate (or lowest level) management-level person to be notified is a Title IX coordinator, vice-principal, principal, superintendent, or school board member. *But cf.* **Rowinsky**, 80 F.3d at 1021 (Dennis, J., dissenting) (student-student sexual harassment is actionable under Title IX if "*board* had knowledge of the harassment and failed to take appropriate corrective action") (emphasis added). Obviously,

that question is strongly linked to the facts and circumstances, including applicable state law, of each case. It *is* clear, however, that, to even begin to qualify as "management-level", a person must have some authority over employees, including, perhaps, the power to hire, fire, or discipline. This condition stems from case law and the language of Title VII itself.

Title VII defines an "employer" to include all "agent[s]", but *not* all "employees", of the employer. 42 U.S.C. § 2000e(b). The Supreme Court focused on this distinction in *Meritor Savings Bank,* 477 U.S. at 72: "Congress' decision to define 'employer' to include 'any agent' of an employer ... surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." Our court is well aware of this distinction. *See Moham v. Steego Corp.*, 3 F.3d 873, 876 (5th Cir. 1993), *cert. denied*, 510 U.S. 1197 (1994).

Courts have interpreted the term "agent" to mean someone who "serves in a supervisory position and exercises significant control over ... hiring, firing, or conditions of employment". *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir. 1989) *vacated in part*, 900 F.2d 27 (4th Cir. 1990); *see also Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994). In fact, the Fourth Circuit has explained, "[The agent] need not have ultimate authority to hire or fire to qualify as an employer, as

long as he or she has significant input into such personnel decisions". *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir. 1989).

This definition of "employer" (including agents) is synonymous with the understanding our court had of "employer" in *DeAngelis v. El Paso Municipal Police Officers Ass'n*, when it listed as one of the elements of a Title VII plaintiff's *prima facie* case for hostile environment that "the employer knew or should have known of the harassment and failed to take prompt remedial action". *DeAngelis*, 51 F.3d at 593. Accordingly, the term "higher-management personnel" includes only those individuals with some degree of job-related authority over other employees.

Thus, in *Nash v. Electrospace System, Inc.*, our court explained that an employer did not know, and could not have known, of the harassment "until [the plaintiff] complained to those *with authority to address the problem*". *Nash*, 9 F.3d at 404 (emphasis added). And, in *Hall v. Gus Construction Co.*, the Eighth Circuit found that a construction company had actual notice of a hostile environment when a foreman had witnessed and received complaints about the sexually harassing conduct. *Hall*, 842 F.2d at 1016.

In sum, if Title VII or § 219 principles are applicable for Title IX liability, the school district does not have actual knowledge of hostile environment sexual harassment until someone

- 21 -

with authority to take remedial action is notified.  Again, it may well be that that someone must be a member of the school board.

### b.

In any event, it is clear that Mendoza, the teacher put on notice, did not have the requisite authority.  At the elementary school, she served only in the capacity of a classroom teacher. Mendoza did not serve on the school board or as a superintendent, assistant superintendent, principal, or assistant-principal. And, the CISD student handbook designated the *assistant superintendent*, not Mendoza, as the CISD Title IX coordinator (and the person to receive student complaints). Mendoza simply had no job-related authority over Perales or, for that matter, any other teacher. As a final indicator, we note that, when asked at trial whether she was an appropriate person to receive a student's complaint of sexual abuse and harassment, Mendoza invoked her Fifth Amendment rights.

### c.

Accordingly, we apply these assumptions and conclusions to this record to determine whether the school district had the requisite actual or constructive notice.  As stated, we hold that it did not.

Leija was not in Perales' gym/health class after the 1989-90 school year; and, in early 1991, during Leija's third grade year, she and her family left Canutillo. Perales, however, continued to

sexually abuse his students.  In October 1990, a parent complained to the assistant-principal at the elementary school that Perales had sexually molested her daughter.  The allegation was investigated, and Perales was warned about his interaction with the students.  In February 1991, four more girls complained of sexual abuse, this time to the principal, who promptly reported the incidents to the CISD superintendent.  CISD immediately suspended Perales.  Law enforcement officials investigated the matter, and Perales was subsequently indicted and convicted of sexual abuse of a child, whereupon CISD terminated him.

Therefore, concerning the time frame during which the sexual abuse of Leija occurred, the record reflects the following: neither Leija nor her mother told anyone at the school besides Mendoza (a teacher) what Perales was doing; Mendoza was not at management-level -- she did not have any authority over Perales or other authority, including to take the requisite remedial action, so that the notice to her did not constitute notice to CISD; no member of the school board, the superintendent, the assistant superintendent, the principal, the assistant-principal or any other management-level personnel were notified of Perales' actions; and, there was no evidence that his conduct was then so pervasive that a reasonable juror could conclude that CISD "should have known" of the abuse.  On these facts, CISD had neither actual nor constructive notice of Perales' sexual abuse of Leija. Consequently, for the liability standards akin to Title VII or §

219, as with that discussed earlier for Title VI, the Title IX claim was insufficient as a matter of law.

III.

For the foregoing reasons, the Title IX claim fails. (Accordingly, we do not address the damages issues.) Therefore, we **REVERSE** the denial of CISD's motion for judgment as a matter of law on that claim, and **REMAND** for entry of judgment in favor of the school district.

***REVERSED and REMANDED***


**DENNIS,** Circuit Judge, dissenting:


I respectfully dissent.

First, I disagree with the majority's failure to consider and follow the substantial jurisprudential and regulatory developments that have taken place under Title IX since this court visited this fast changing legal area in *Rowinsky v. Bryan ISD,* 80 F.3d 1006 (5th Cir. 1996). I am persuaded by the new developments that the substantive standards that have evolved under Title VII should be applied in actions for monetary damages under Title IX based on either the sexual harassment of a student by a school employee or the sexual harassment of a student by his or her peers.

Second, I could have agreed with the majority's result had this case presented only the issue of whether a complaint of hostile environment sexual harassment was made to management-level

school employees. However, the certified order appealed from fairly includes other issues that should be addressed by this court, *viz.*, (1) whether the complaints by the second grader and her mother to her primary or home room teacher about her sexual molestation by her male health and physical education teacher constituted sufficient notice because the school district failed to provide an adequate complaint and grievance procedure as required by Title IX regulations but instead issued a school booklet directing students and parents to direct complaints to the child's primary or home room teacher; (2) whether a reasonable trier of fact could have found from the evidence that the male teacher's conduct constituted quid pro quo harassment, as well as hostile environment harassment, of the female second grader, for which the school district is liable regardless of whether it knew or should have known or approved of the harassment.

Finally, applying the recently developed sexual harassment precepts, I conclude that (1) the plaintiffs-appellees presented sufficient evidence from which a reasonable trier of fact could conclude that the school district had notice of the sexual harassment, which it failed to take adequate remedial steps to arrest and prevent, and therefore could be held liable for damages caused by hostile environment discrimination; and (2), in the alternative, a reasonable trier of fact could find that the male teacher's conduct constituted quid pro sexual harassment of the

female second-grade student and, accordingly, if judgment is not rendered at this level for the plaintiff-appellees, the case should be remanded for further proceedings on the quid pro quo issue.

Moreover, in either event, this court should hold that the trial court exceeded its authority in denying the plaintiff plenary damages and in imposing restrictions upon their recovery not provided by law.

## JURISPRUDENTIAL DEVELOPMENTS

Title IX provides that "no person in the United States shall, on the basis of sex, ... be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 USC § 1681 (a). In *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60 (1992), the Supreme Court recognized that Title IX affords an implied private cause of action for money damages in cases of intentional sexual discrimination; and that a teacher's sexual harassment and abuse of a student because of the student's sex constitutes sexual discrimination. *Id.*, 503 U.S. at 74-75, (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

In reviewing claims of sexual discrimination brought under Title IX, whether by students or employees, courts have generally adopted the same legal standards that are applied to such claims under Title VII. Student Claims*: Kinman v. Omaha Public School District,* 94 F.3d 463, 467-68 (8th Cir. 1996); *Seamons v. Snow,* 84

F.3d 1226, 1232 (10th Cir. 1996); *Davis v. Monroe County Bd. of Educ.,* 74 F.3d 1186 (11th Cir. 1996), *vacated, pending reh'g en banc; Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir. 1995); *Brown v. Hot, Sexy and Safer Productions*, 68 F.3d 525 (1st Cir. 1995); *Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir. 1994); *Roberts v. Colo. State Bd. of Agriculture,* 998 F.2d 824, 832 (10th Cir.), *cert. denied*, ---U.S. ---, 114 S.Ct. 580 (1993); *Bosley v. Kearney R-1 Sch. Dist.,* 904 F. Supp. 1006, (W.D.Mo. 1995); *Sharif by Salahuddin v. NYS Ed. Dep.,* 709 F.Supp. 345 (S.D.N.Y. 1989); *Moise v. Temple Univ. Sch. Med.,* 613 F.Supp. 1360 (E.D.Pa. 1985), *aff'd*, 800 F.2d 1136 (3d. Cir. 1986); <u>Employee Claims</u>: *Brine v. Univ. of Iowa,* 90 F.3d 271, 275-6 (8th Cir. 1996); *Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 896-98 (1st Cir. 1988); *Preston v. Comm. of Va.,* 31 F.3d 203 (4th Cir. 1994); *Mabry v. State Bd. of Community Colleges and Occupational Educ.,* 813 F.2d 311 (10th Cir. 1987), *cert. denied*, 484 U.S. 849 (1987); *cf. Doe v. Taylor*, 975 F.2d 137, 149 (5th Cir. 1992)("[T]here is no meaningful distinction between the work environment and school environment which would forbid such discrimination in the former context and tolerate it in the latter.")

The circuits addressing the elements of a student's sexual harassment claim based on hostile educational environment agree that the plaintiff must prove: (1) that the student belongs to a protected group; (2) that the student was subject to unwelcome

sexual harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of the student's education and create an abusive educational environment; and (5) that some basis for institutional liability has been established. *Kinman v. Omaha Public Sch. Dist.*, 94 F.3d 463, 467-68 (8th Cir. 1996); *Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996); *Davis v. Monroe County Bd. of Educ.*, 74 F.3d 1186 (11th Cir. 1996), *vacated, pending reh'g en banc; Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir. 1995).

A majority of those circuits have held that in order to establish the fifth element--*viz.*, that there is a basis for the educational institution's liability--Title VII principles apply: (1) The plaintiff must show that the school knew or should have known of the harassment in question and failed to take prompt remedial action; and (2) the student can satisfy the "knew or should have known" requirement by demonstrating that adequate information concerning the harassment was communicated to management-level school employees or by showing that the pervasiveness of the harassment gives rise to a reasonable inference of knowledge or constructive knowledge. *Kinman v. Omaha Sch. Dist., supra; Davis v. Monroe County Bd. of Educ., supra.; Murray v. New York Univ. College of Dentistry*, *supra*. *Accord Doe v. Petaluma City Sch. Dist.,* 1996 WL 432298 (N.D.Cal. 1996);

*Patricia H. v. Berkeley Unified Sch.* Dist., 830 F.Supp. 1288 (N.D.Cal. 1993); *Burrow v. Postville Community Sch. Dist.*, 929 F.Supp. 1193 (N.D. Iowa 1996); *Bruneau v. South Kortright Central Sch. Dist.*, 935 F.Supp. 162 (N.D.N.Y. 1996); *Linson v. Trustees of the Univ. of Penn.*, 1996 WL 479532 (E.D.Pa.).  The court in *Seamons v. Snow, supra*, disposed of the plaintiff's claim solely on the basis of his failure to allege facts constituting sexual discrimination without addressing the notice issue.

That Title VII standards should be applied in analyzing a Title IX sexual harassment claim by a student is also evident from the decisions of the Supreme Court.  Although the Court did not expressly address the issue in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992), in holding that Title IX authorizes awards of compensatory damages to Title IX plaintiffs generally, the Court invoked Title VII authority and principles.  *Franklin* involved a high school student's allegations that she had been sexually harassed and assaulted by a teacher and that school officials with actual knowledge of the teacher's misconduct had failed to intervene.  *Id.*, 503 U.S. at 64-65.  In rejecting the argument that the specific language of Title IX did not give educational institutions sufficient notice of their liability for damages for such intentional discrimination, the *Franklin* Court stated:

> Unquestionably, Title IX placed on [such institutions] the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav[ings]* Bank, *FSB v. Vinson,* 477 U.S.57, 64 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.

*Id.*, 503 U.S. at 75. The Court's citation to *Meritor Savings Bank*, a Title VII case, in support of *Franklin's* central holding indicates that, in a Title IX suit for gender discrimination based on sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII. *See Murray v. New York Univ. College of Dentistry,* 57 F.3d at 248-49.

Furthermore, the Supreme Court has consistently, both before and after *Franklin,* used the term "intentional" to distinguish disparate treatment discrimination, including hostile environment discrimination, from unintentional disparate impact discrimination. Thus, by stating that money damages may be awarded only for intentional violations of Title IX, the Supreme Court did not intend to foreclose student victims from such recovery for sexual harassment amounting to either quid pro quo or hostile environment discrimination under principles modeled on the Title VII standards.

In *Guardians Ass'n v. Civil Serv. Comm's of New York*, 463 U.S. 582 (1983), the Supreme Court held, in a Title VI action prior to *Franklin,* that monetary damages should not be awarded under Title

VI for unintentional disparate impact discrimination. Justice White, announcing the judgment of the Court, explicitly noted that the holding that damages were not available for unintentional discrimination based on disparate impact left open the issue of whether money damages would be appropriate in cases of "intentional discrimination." *Id.* at 597. Thus, Justice White clearly implied that "intentional discrimination" is discrimination other than that based on disparate impact. This section of Justice White's opinion was joined by Justice Rehnquist. Additionally, the distinction between intentional discrimination and unintentional disparate impact discrimination was implicit in the concurring opinions and dissents of Justices O'Connor, *id.* at 613, Marshall, *id.* at 616, and Stevens, Brennan and Blackmun, *id.* at 645. Therefore, a majority of the *Guardians* Court implicitly but clearly defined "intentional discrimination" as discrimination other than disparate impact discrimination. *Doe v. Petaluma City Sch. Dist.*, 1996 WL 432298 at *3 (N.D.Cal. July 22, 1996).

Subsequent to *Franklin,* the Supreme Court in *Landgraf v. USI Film Products,* 511 U.S. 244 (1994), confirmed the distinction it draws between intentional discrimination (including hostile environment sexual harassment) and unintentional disparate impact discrimination. The Civil Rights Act of 1991 created a right to recover compensatory damages in cases of "unlawful intentional discrimination (not an employment practice that is unlawful because

of its disparate impact)" prohibited by Title VII.  42 U.S.C. §
1981(a).  This amendment to Title VII sets up the same dichotomy as
did the Supreme Court in *Franklin* and *Guardians*, for it limits the
award of money damages to cases involving "intentional
discrimination."  In *Landgraf* the Supreme Court, in a Title VII
case involving a hostile work environment claim, held that the
provisions affording the right to such money damages do not apply
to a Title VII case that was pending on appeal when the statute was
enacted.  The Supreme Court, in its discussion of whether the
amendment should be given retroactive application, clearly assumed
that "intentional discrimination" would include hostile work
environment discrimination based on co-worker harassment.
*Landgraf*, 511 U.S. at 249-50.  The Court's assumption evidently was
based on its own classification of hostile environment
discrimination as "intentional discrimination."  For example, the
Court stated that the amendment "confers a new right to monetary
relief on persons like petitioner who were victims of a hostile
work environment but were not constructively discharged."  *Id.* at
283.  Thus the *Guardians* and *Landgraf* opinions indicate that when
the Supreme Court referred to "intentional discrimination" in
*Franklin*, it was referring to  any form of discrimination other
than disparate impact discrimination.  In other words, "intentional
discrimination" includes hostile work environment discrimination.
*See Doe v. Petaluma City Sch. Dist.*, 1996 WL 432298 at *7-8 (N.D.

Cal. July 22, 1996) (citing also as earlier authority *Henson v. City of Dundee*, 682 F.2d 897, 902-05 n.11 (11th Cir. 1982); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990)("[T]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course")).

This background explains why recent cases under the 1991 amendments to Title VII simply characterize hostile work environment discrimination as a species of intentional discrimination, without discussion. *Petaluma*, 1996 WL 432298 at *10 (citing *Townsend v. Indiana Univ.*, 995 F.2d 691 (7th Cir. 1993); *Raney v. Dist. Of Columbia*, 892 F.Supp. 283 (D.D.C. 1995); *Sassaman v. Heart City Toyota*, 879 F.Supp. 901 (N.D.Ind. 1994); *Splunge v. Shoney's, Inc.*, 874 F.Supp. 1258 (M.D.Ala. 1994); *Preston v. Income Producing Management, Inc.*, 871 F.Supp. 411 (D.Kan. 1994); *Meadows v. Guptill*, 856 F.Supp. 1362 (D.Ariz. 1993); *Powell v. Las Vegas Hilton Corp.*, 841 F.Supp. 1024 (D.Nev. 1992)). "If there was ambiguity regarding whether hostile environment claims were a species of intentional discrimination, this ambiguity has now been resolved by the 1991 amendments and the cases applying them." *Id.*

Moreover, the recent draft guidances issued by the Office of Civil Rights of the Department of Education discussed below

confirms that the majority of the courts are correct in applying the standards developed under Title VII in the adjudication and review of students' claims based on Title IX violations involving peer or school employee hostile environment discrimination.

**REGULATORY DEVELOPMENTS**

In *Rowinsky* we recognized that "[w]hen interpreting title IX, we accord the OCR's [Office of Civil Rights of the Department of Education] interpretations appreciable deference." 80 F.3d at 1015 n.20 (citing *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993)), which elaborated:

> [W]e treat [the Department of Education], acting through its OCR, as the administrative agency charged with administering Title IX.
> Recognizing the agency's role has important practical and legal consequences. Although [the Department] is not a party to this appeal, we must accord its interpretation of Title IX appreciable deference. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)*(noting that the Supreme Court "gives great deference to the interpretation given the statute by the officers or agency charged with its administration").

Nevertheless, the *Rowinsky* majority concluded that 34 C.F.R. § 106.31[1] cannot reasonably be read to prohibit a recipient from

---

[1] **Subpart D--Discrimination on the Basis of Sex in Education Programs and Activities Prohibited**

**§ 106.31 Education Programs and Activities.**
(a) *General.* Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic,

knowingly allowing peer sexual harassment of students.  80 F.3d at 1015.  The majority inferred as much because the most definitive statement by the OCR on sexual harassment at that time left unresolved the issue of peer sexual harassment.  *Id*.

Subsequent to the handing down of *Rowinsky* on April 2, 1996, however, the OCR issued (1) on August 16, 1996, a draft document on "Sexual Harassment Guidance : Peer Sexual Harassment [Guidance]," providing educational institutions with information regarding the standards used by OCR to investigate and resolve cases involving

extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives or benefits from Federal financial assistance.....

(b) *Specific prohibitions.* Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

\* \* \*

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

\* \* \*

(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

claims that peer sexual harassment has created a hostile environment in violation of Title IX. 61 Fed. Reg. 42,728 (August 16, 1996); and (2) on October 4, 1996, a draft document on "Sexual Harassment Guidance: Harassment of Students by School Employees," providing educational institutions with information regarding the standards used by the OCR to investigate and resolve cases involving claims that sexual harassment of students by school employees has created a hostile environment in violation of Title IX. 61 Fed. Reg. 52,171 (October 4, 1996). (**N.B.** The OCR attached both draft documents as appendices to 61 Fed. Reg. 52,171.) The OCR invited interested parties to comment on the clarity and completeness of the draft guidances. The periods for comment on these draft documents have elapsed. The OCR is proceeding to combine the substance of the two drafts in one Guidance that will be issued in the very near future.

In effect, the new OCR Guidance will provide that, in accordance with the OCR's longstanding nationwide practice, the legal principles developed under Title VII should be applied in determining when a hostile environment discrimination violation has occurred because of sexual harassment of a student by either peers or a school employee. In the more recent draft document the OCR stated:

> Consistent with the Supreme Court's decision in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992)(holding that a student may sue a school district for damages based on sexual harassment by a teacher), OCR has applied Title IX to

prohibit sexual harassment of students by school employees. The standards in the Guidance reflect OCR's longstanding nationwide practice and reflect well established legal principles developed under Title VII of the Civil Rights Act of 1964, which prohibits gender discrimination in employment.

61 Fed. Reg. at 52,172.

Below are highlights of the two Guidance drafts. The material is lifted as almost verbatim excerpts from the drafts. Footnote material has been merged with text material in many instances. Citations of authorities have been selectively drawn from the footnotes. This presents a quick, incomplete view of some of the significant provisions.

### School Employee Harassment

According to the OCR draft Guidance, sexual harassment of students by a school employee is a form of prohibited sex discrimination in the following circumstances:

**Quid Pro Quo Harassment**--A school employee explicitly or implicitly conditions a student's participation in an education program or school activity or bases an educational decision on the student's submission to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. Quid pro quo harassment is equally unlawful whether the student resists and suffers the threatened harm or submits and thus avoids the threatened harm. [61 Fed.Reg. at 52,172].

**Hostile Environment Harassment**--Sexually harassing conduct by an employee (that can include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature) is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or activity, or to create a hostile or abusive educational environment. [61 Fed.Reg. at 52,172].

A school's liability for sexual harassment by its employees is determined by application of agency principles, *see Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 (1992), i.e., by principles governing the delegation of authority to or authorization of another person to act on one's behalf. Accordingly, a school will always be liable for even one instance of quid pro quo harassment by a school employee in a position of authority, such as a teacher or administrator, whether or not it knew, should have known, or approved of the harassment at issue. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 70-71 (1986); *see also Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 901 (1st Cir. 1988); EEOC Notice N-915-050, March 1990, at 21; *Kadiki v. Virginia Commonwealth Univ.*, 892 F. Supp. 746, 752 (E.D. Va. 1995). Under agency principles if a teacher or other employee uses the authority he or she is given (e.g., to assign grades) to force a student to submit to sexual demands, the employee "stands in the

- 38 -

shoes" of the school and the school will be responsible for the use of its authority by the employee/agent. *Kadiki*, 892 F.Supp. at 754-55. [61 Fed.Reg. at 52,172-3].

A school will also be liable for hostile environment sexual harassment by its employees, i.e., for harassment that is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive environment if the employee--(1) Acted with apparent authority (i.e., because of the school's conduct, the employee reasonably appears to be acting on behalf of the school, whether or not the employee acted with authority); *see* Restatement (2d) Agency § 219(2)(d); *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1352 (4th Cir. 1994); or (2) was aided in carrying out the sexual harassment of students by his or her position of authority with the institution. EEOC Policy Guidance on Current Issues of Sexual Harassment at 28; *Martin v. Cavalier Hotel Corp.* 48 F.3d at 1352; *Karibian*, 14 F.3d at 780; *Hirshfeld v. New Mexico Corrections Dept.*, 916 F.2d 575, 579 (10th Cir. 1990). In many cases the line between quid pro quo and hostile environment discrimination will be blurred, and an employee's conduct may constitute both types of harassment. [*Id.* at 52,173].

Even in situations not involving (i) quid pro quo harassment, (ii) creation of a hostile environment through an employee's apparent authority, or (iii) creation of a hostile environment in

which the employee is aided in carrying out the sexual harassment by his or her position of authority, a school will be liable for sexual harassment of its students by its employees if the school has notice of the harassment (i.e., knew or should have known of the harassment), but failed to take immediate and appropriate steps to remedy it. *Cf. Karibian*, 14 F.3d at 780. Determining when a school has notice of sexual harassment is discussed in the Peer Harassment Guidance. [61 Fed.Reg. at 72,173] (discussed *infra* at p. 18 *et seq.).*

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination. 34 CFR 106.8(a) and (b)[2]. If a school fails to do

---

[2]     **§ 106.8 Designation of responsible employee and adoption of grievance procedures.**

(a) *Designation of responsible employee.* Each recipient shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to such recipient alleging any actions which would be prohibited by this part. The recipient shall notify all its students and employees of the name, office address and telephone number of the employee or employees appointed pursuant to this paragraph.

(b) *Complaint procedure of recipient.* A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

so, it will be liable for the lack of procedures regardless of whether sexual harassment occurred.  In addition, if OCR determines that the harassment occurred, the school may be in violation of Title IX as to the harassment, under the agency principles previously discussed, because a school's failure to implement effective policies and procedures against discrimination may create apparent authority for school employees to harass students.  EEOC Policy Guidance at p. 25 ("***in the absence of a strong, widely disseminated, and consistently enforced employer policy against sexual harassment, and an effective complaint procedure, employees could reasonably believe that a harassing supervisor's actions will be ignored, tolerated, or even condoned by upper management.") [61 Fed.Reg. at 52,173].

In all cases of alleged harassment by employees investigated by OCR, OCR will determine whether a school has taken immediate and appropriate steps reasonably calculated to end any harassment that has occurred, remedy its effects, and prevent harassment from occurring again.  If the school has done so, OCR will consider the case against that school resolved and will take no further action.  This is true in cases in which the school was in violation of Title IX, as well as those in which there has been no violation of federal law.  However, schools should note that the Supreme Court has held that, should a student file a private lawsuit under Title IX, monetary damages are available as a remedy if there has been a

violation of Title IX. *Franklin*, 503 U.S. at 76. Of course, a school's immediate and appropriate remedial actions are relevant in determining the extent and nature of damages suffered by a plaintiff. [61 Fed.Reg. at 52,173].

Although generally, a plaintiff must prove that the sexual harassment is unwelcome in order to state an actionable claim, if elementary students are involved, welcomeness will not be an issue: OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual. Because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class. *See Leija v. Canutillo ISD*, 887 F. Supp. 947, 945 (N.D. Tex. 1993)("young children, taught to respect their teachers and follow their teacher's request, often do not know what to do when abuse occurs"). [61 Fed.Reg. at 52,173].

In determining whether an employee's sexual harassment of a student created a hostile environment, i.e., whether it was sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or create a hostile or abusive educational environment, OCR considers the factors discussed in the Peer Harassment Guidance. [61 Fed.Reg. at 52,175-83].

**Peer Harassment**

The Peer Harassment draft guidance discusses the analysis that the OCR follows, and that recipients of federal funding should use, when investigating allegations that sexual harassment of a student or students by another student or group of students (peer harassment) has created a hostile environment at an educational institution that receives federal financial assistance. [61 Fed.Reg. at 52,175].

Under Title IX and its implementing regulations, no individual may be discriminated against on the basis of sex in educational programs receiving federal financial assistance. 20 USC § 1681 *et seq.;* 34 CFR § 106.31(b), *supra* n.1. In analyzing sexual harassment claims, the Department also applies, as appropriate to the educational context, many of the legal principles applicable to sexual harassment in the work place, developed under Title VII of the Civil Rights Act of 1964, 42 USC § 2000e-2(a). *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 (1992)(applying Title VII principles in determining that a student was entitled to protection from sexual harassment by a teacher in school under Title IX); *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995)(same); *Doe v. Petaluma City Sch. Dist.*, 830 F. Supp. 1560, 1571-72 (N.D.Cal. 1993) (same), *rev'd in part on other grounds*, 54 F.3d 1447 (9th Cir. 1995). [61 Fed.Reg. at 52,175].

In addition, many of the principles applicable to racial harassment under Title VI of the Civil Rights Act, 42 USC § 2000d *et seq.*, and Title VII also apply to sexual harassment under Title IX.   Indeed, Title IX was modeled on Title VI, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694 (1979).[3]   [61 Fed.Reg. at 52,175 n.2].

Peer sexual harassment is a form of prohibited sex discrimination where the harassing conduct creates a hostile environment.   *See Franklin*, 503 U.S. at 75; *Bosley v. Kearney R-1SD*, 904 F.Supp. 1006, 1023 (W.D.Mo. 1995); *Burrow v. Postville CSD*, 1996 U.S. Dist LEXIS 9147 at *34 (N.D. Iowa June 17, 1996); *Oona R.-S. v. Santa Rosa City Schools*, 890 F.Supp. 1452 (N.D.Cal. 1995); *Davis v. Monroe County Bd. of Ed.*, 74 F.3d 1186, 1193 (11th Cir. 1996), *vacated, reh'g granted; cf. Murray v. NYU*, 57 F.3d at 249.   Title IX does not make a school responsible for the actions of the harassing student, but rather for its own discrimination in failing to act and permitting the harassment to continue once a school official knows that it is happening.   [61 Fed. Reg. at 52,180 n.3].

A school will have notice of a hostile environment when it knew or should have known of the harassment.   *Davis v. Monroe County*, 74 F.3d at 1194, and other authorities including *Rosa H. v.*

---

[3] For information on racial harassment, see the Department's Notice of Investigative Guidance for Racial Harassment, 59 Fed Reg. 11,448 (1994).

*San Elizario ISD*, 887 F.Supp. 140, 143 (W.D.Tex. 1995)("[T]he school district is in the best position to be on the lookout for discriminatory conduct * * * A 'knew or should have known' requirement mandates that the school district monitor its employees and students and prevents a situation where the district, through its employees or policies, turns a blind eye toward discriminatory conduct.")].  Moreover, schools are required by the Title IX regulations to have grievance procedures through which students can complain of alleged sex discrimination by other students, including sexual harassment.  34 CFR § 106.8(b). [61 Fed.Reg. 52,178-79].

A school will be liable for the conduct of its students that creates a sexually hostile environment where (i) a hostile environment exists, (ii) the school knows ("has notice") of the harassment, and (iii) the school fails to take immediate and appropriate steps to remedy it.  [61 Fed.Reg. at 52,177]. **[**Citing again *Franklin, Bosley, Doe, Burrow, Oona R.-S., Davis,* and *Murray,* cited above.]

A recipient can receive notice of peer sexual harassment creating a hostile environment in many different ways.  Because schools are required to have Title IX grievance procedures, a student may have filed a grievance or complained to a teacher about fellow students sexually harassing him or her.  A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, an

affirmative action officer, or staff in the office of student affairs. An agent or responsible employee of the institution may have witnessed the harassment. The recipient may receive notice in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media. The recipient also may have received notice from flyers about the incident[s] posted around the school. *See* Racial Harassment Guidance, 59 Fed. Reg. at 11,450 (discussing how a school may receive notice). [61 Fed.Reg. at 52,178].

Constructive notice exists when the school "should have" known about the harassment--when the school would have found out about the harassment through a "reasonably diligent inquiry." *See Yates v. Avco Corp.*, 819 F.2d 630, 634-36 (6th Cir. 1987)(Title VII case); *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983)(same); Racial Harassment Investigative Guidance, 59 Fed. Reg. at 11,450. In some cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment--where the harassment is widespread, openly practiced, or well-known to students and staff (such as sexual harassment occurring in hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision).[61 Fed.Reg. at 52,177]

**CONCLUSIONS**

- 46 -

I respectfully disagree with the majority opinion's failure to apply Title IX as impliedly interpreted by the Supreme Court in *Franklin v. Gwinnett County Public Schools,* as implemented by 34 CFR § 106.1 *et seq.,* and as interpreted by the OCR's draft Guidances on Harassment of Students by School Employees, 61 Fed.Reg. at 52171-52183 (October 4, 1996). In my opinion these authorities strongly indicate that we should apply the standards developed under Title VII in the adjudication and review of a student's claim of hostile environment sexual discrimination by a school employee under Title IX. All of the other circuits which have addressed this question have done so. *Kinman v. Omaha Public Sch. Dist.,* 94 F.3d 463 (8th Cir. 1996); *Seamons v. Snow,* 84 F.3d 1226 (10th Cir. 1996); *Davis v. Monroe County Bd. of Educ.,* 74 F.3d 1186 (11th Cir. 1996), *vacated, pending reh'g en banc;* *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243 (2d Cir. 1995). The majority opinion does not offer any cogent legal reason for its failure to recognize and follow these authorities. Furthermore, although this court may not have been aware of the OCR's draft guidances when the case was argued, now that we aware of them we should give great deference to the interpretations of the OCR as the administrative agency charged with administering Title IX. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984); *Udall v. Tallman*, 380 U.S. 1 (1965); *Rowinsky v. Bryan ISD*, 80 F.3d 1006 (5th Cir. 1996).

Accordingly, in a Title IX action based on hostile environment discrimination caused by a school employee's sexual harassment of a student, the plaintiff must establish a basis for the educational institution's liability. This requires the plaintiff to show that the school knew or should have known of the harassment in question and failed to take prompt remedial action. Ordinarily, the plaintiff can satisfy the "knew or should have known" requirement by demonstrating that information of the harassment was communicated to management-level school employees or by showing that the pervasiveness of the harassment gave rise to an inference of actual or constructive knowledge. In the present case, because it appears that the only school employee who received any communication or information about the harassment was a teacher, not a management-level school employee, the plaintiffs would have failed to prove their hostile environment claim, had the school district complied with its obligations under the Title IX regulations.

Schools are required by the Title IX regulations, however, to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination. 34 CFR § 106.8(b); 61 Fed.Reg. at 52,173. If a school fails to do so, it will be liable under Title IX for the lack of grievance procedures, regardless of whether

sexual harassment occurred. *Id.* In addition, if OCR determines that harassment occurred, the school may be in violation of Title IX as to the harassment under agency principles because the failure to implement effective policies and procedures against discrimination may create apparent authority for school employees to harass students. *Id.; see also* EEOC Policy Guidance at 25. Because we owe accord great deference to the interpretation of Title IX by the OCR due to its role as the administrative agency charged with administering the statute, these principles should be applied to the evidence in the present case to determine whether notice of the harassment should be imputed to the school district.

The plaintiffs' brief and the District Court's order point to evidence from which a reasonable trier of fact could conclude that notice of the harassment should be attributed to the school district. There was evidence that prior to the incidents in question the school district had no policy directing students and parents as to how to make a report of sexual harassment. The Canutillo Elementary Student Handbook directed students or parents who had any complaint to first take it up with the student's primary teacher. Rosemarie's understanding was that she should direct any complaints to her primary teacher. The evidence further indicated that Rosemarie did not know where the office of the superintendent was located or that there was a Title IX coordinator ostensibly responsible for investigating allegations of child

abuse. In its memorandum and opinion order the District Court found that when Rosemarie Leija and her classmate Lizette reported the molestations to their primary teacher, that teacher discounted the girls' story and took no action of any kind to address the matter. When Leija's parents later reported the harassment to the same teacher, she advised against stirring up trouble and convinced the parents nothing was happening.

Whether a school district can be charged with knowledge of a student's sexual harassment in a civil action because of its failure to comply with its obligations under Title IX and CFR § 106.8 to establish adequate complaint and grievance procedures is is a question within our jurisdiction. On consideration of an interlocutory order certified for appeal by a district court pursuant to 28 USC § 1292(b), a court of appeals may exercise jurisdiction over any question that is included within the order containing the controlling question of law and is not tied to the particular question formulated by the District Court. *Yamaha v. Motor Corp. Calhoun*, --- U.S.---, 116 S.Ct. 619 (1996). As the Court explained:

> [T]he appellate court may address any issue fairly included within the certified order because "it is the *order* that is appealable, and not the controlling question identified by the district court." 9 J. Moore & B. Ward, Moore's Federal Practice ¶ 110.25[1], p. 300 (2d 3d. 1995). *See also* 16 C. Wright, A. Miller, E. Cooper, & E. Gressman, Federal Practice and Procedure §, pp. 144-145 (1977)("[T]he court of appeals may review the entire order, either to consider a question different than the one certified as controlling or to decide the case despite the lack of any identified controlling

> question."); Note, Interlocutory Appeals in the Federal Courts Under 28 USC § 1292(b), 88 Harv. L. Rev. 607, 628-629 (1975)("scope of review [includes] all issues material to the order in question").

*Id.*, 116 S.Ct. at 623.

By the same token, this court can exercise jurisdiction over the question of whether the male health and physical education teacher committed quid pro quo sexual harassment upon Rosemarie. This is an issue that is material to and fairly included within the certified order. The District Court recognized in its memorandum opinion and order that quid quo pro abuse is a type of sexual harassment actionable under Title VII in which the actions of the employer's agents or supervisory personnel are imputed to the employer whether or not the employer knew, should have known, or approved of the actions. That court further concluded that Title IX cases are properly analyzed, in part, under these two types of discrimination.

Similarly, the OCR draft Guidance provides that quid pro quo harassment occurs when a school employee explicitly or implicitly conditions a student's participation in an education program or school activity or bases an educational decision on the student's submission to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. 61 Fed. Reg. at 52,172, citing *Alexander v. Yale Univ.*, 459 F.Supp. 1, 4 (D. Conn. 1977); *Kadiki v. Va. Commonwealth Univ.,* 892 F.Supp. 746, 752 (E.D.Va. 1995); *Karibian v. Columbia Univ.*, 14 F.3d 773,

777-79 (2d Cir. 1994). A school will always be liable for even one instance of quid pro quo harassment by a school employee in a position of authority, such as a teacher or administrator, whether or not it knew, should have known, or approved of the harassment. *See Meritor Savings Bank v. Vinson,* 477 U.S. at 70-71; *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 901 (1st Cir. 1988); EEOC Notice N-915-050, March 1990, Policy Guidance on Current Issues of Sexual Harassment, at 21; *Kadiki*, 892 F.Supp. at 752; 61 Fed. Reg. at 52,173.

The District Court found that Tony Perales taught Rosemarie Leija health and physical education in the second grade during the 1989-90 school year. During that year, Coach Perales sexually molested her while she was in his classroom. Most of the abuse occurred while he was showing movies to the class in a darkened classroom. He would instruct Rosemarie to come to the back of the room and sit on his lap. He would then place his hands beneath her undergarments and rub her chest, her buttocks, and between her legs. The plaintiffs' brief points to evidence in the record that Perales referred to Rosemarie as "Princess," although he did not have pet names for the other students. He singled out Rosemarie for special attention, allowing her to sit out physical education exercises and to do favors and special tasks for him, such as running errands. He also gave her candy and other gifts that he did not confer on the other students.

Consequently, a reasonable trier of fact could have found that Rosemarie was placed in a situation, as has occurred in many cases, in which the line between quid pro quo and hostile environment discrimination was blurred. See 61 Fed.Reg. at 52,173. At her young age Rosemarie reasonably could have believed that she had to tolerate sexual touching, manipulating and petting by Perales as the price he required for his gifts and special treatment of her, his continued favoritism and goodwill, her continued participation in his class and in the health film viewing, and her avoidance of embarrassment and humiliation that she might suffer had she challenged his advances. Consequently, if this court does not affirm the judgment of liability against the school district on the plaintiffs' hostile environment sexual discrimination claim, it should either do so on the grounds of the school district's liability for quid pro quo sexual harassment, or it should reserve the latter issue for consideration by the district court upon remand.

The District Court clearly erred in placing limits on damages recoverable under Title IX. In *Franklin* the Supreme Court held that plaintiffs may recover compensatory damages under Title IX. The cornerstone to the Court's analysis was that all appropriate remedies are presumed available unless Congress has expressly indicated otherwise. *Franklin,* 503 U.S. at 68. The Court noted that the amendments to Title IX subsequent to its decision in

*Cannon* indicated that Congress did not intend to limit remedies available in a suit brought under Title IX. *Id.* at 72-73.  Based on the amendments to Title IX and other legislative enactments, the "traditional backdrop of a full panoply of rights," and the Court's prior decisions, the *Franklin* Court concluded that a private right of action under Title IX provides a full spectrum of remedies to a successful plaintiff. Id. *Accord Rodgers v. Magnet Cove Public Schools*, 34 F.3d 642 (8th Cir. 1994); *Waldrop v. Southern Co. Services, Inc*., 24 F.3d 152 (11th Cir. 1994); *Pandazides v. Virginia Bd. of Educ*., 13 F.3d 823 (4th Cir. 1994).

For the foregoing reasons I respectfully dissent from the majority's decision to reverse the District Court's judgment in favor of the plaintiffs holding the school district liable for damages under Title IX and to remand the case for entry of judgment in favor of the school district.  Instead, for the reasons assigned above, the district court's judgment on liabillity on the basis of hostile environment sexual discrimination should be affirmed and its judgment placing limits on damages recoverable under Title IX should be reversed.  The case should be remanded to the district court for further proceedingss in light of the reasons stated herein.